608 A.2d 1341

JUDY HUMMEL, AS GUARDIAN AD LITEM FOR KELLY HUM-
MEL, PLAINTIFF–APPELLANT, v. DR. NORMAN REISS, JOHN
DOES, M.D. 1–10, SAID NAMES BEING FICTITIOUS AND UN-
KNOWN, JOHN ROE, 1–10, SAID NAMES BEING FICTITIOUS
AND JANE DOES 1–10, SAID NAMES BEING FICTITIOUS,
DEFENDANTS, AND ST. MICHAEL'S HOSPITAL, DEFEN-
DANT–RESPONDENT.

Argued February 19, 1992—Decided July 21, 1992.

*Bruce H. Nagel* argued the cause for appellant (*Nagel &
Rice,* attorneys).

*Richard P. Maggi* argued the cause for respondent (*McDermott & McGee*, attorneys).

The opinion of the Court was delivered by

CLIFFORD, J.

Kelly Hummel was born with severe brain defects on October 13, 1971, fifteen months before the United States Supreme Court established a woman's qualified right to an abortion in *Roe v. Wade*, 410 *U.S.* 113, 93 *S.Ct.* 705, 35 *L.Ed.*2d 147 (1973). She filed this suit in 1988 against, among others, the physician and the hospital who had failed to provide her mother with the opportunity to obtain a therapeutic abortion. The trial court dismissed her claim and the Appellate Division affirmed. We granted certification, 126 *N.J.* 386, 599 *A.*2d 162 (1991).

On this appeal against the hospital only (the physician settled after the Appellate Division decision), plaintiff relies on our decision in *Procanik v. Cillo*, 97 *N.J.* 339, 478 *A.*2d 755 (1984), in which we recognized the wrongful-life cause of action: the right of a child born with birth defects to recover extraordinary medical expenses from a defendant who had negligently failed to inform the child's parents of the condition that produced those defects and thus had deprived the parents of the right to make an informed decision about whether to continue the pregnancy.

We affirm. We hold that plaintiff's reliance on *Procanik* is mistaken and that no wrongful-life cause of action exists for children who were born before *Roe v. Wade*.

I

In 1971 Judy Hummel was pregnant with her fourth child. Her obstetrician was defendant Dr. Norman Reiss, who had delivered her other children. (She had given birth to twins—a boy and a girl—in 1966, and to a boy in 1970. Those deliveries were by cesarian section. She suffered a miscarriage in 1965). On September 6, 1971, about four months before her January

24, 1972, due date, her amniotic sac ruptured. Dr. Reiss admitted her to St. Michael's Hospital, from which she was released two days later. She reentered the hospital with slight vaginal bleeding on September 26th and was released on September 28th.

On October 1, 1971, she entered the hospital a third time, suffering from a fever and other symptoms. The next day she delivered a stillborn, macerated fetus. Her symptoms continued, and an abdominal X-ray disclosed that she was carrying a second fetus. The symptoms had resulted from a serious intrauterine infection.

According to Judy Hummel, who testified on oral depositions, Dr. Reiss recommended that she undergo a therapeutic abortion and she told him that she wanted the abortion. (Dr. Reiss insisted, in his deposition testimony, that although a subsequent accident has eradicated his memory of the events, he would not have advised any woman to have even a therapeutic abortion nor would he have performed one. He testified that although evacuation of the uterus might have been appropriate, he would not have undertaken that procedure in such a way as to destroy the fetus.)

Kelly Hummel's birth on October 13, 1971, was by natural vaginal delivery. She weighed one pound, eleven-and-one-half ounces, and was in severe distress. She suffered psychomotor retardation, is legally blind, and has a mild hearing loss. She will require special care for the rest of her life.

On February 8, 1988, Kelly Hummel, through Judy Hummel as guardian *ad litem,* filed a complaint in the Law Division, naming as defendants Dr. Reiss, St. Michael's Hospital, and twenty fictitious defendants. She sought compensation for extraordinary medical expenses and for pain and suffering, on the grounds that the hospital had failed to "permit [sic] Judy Hummel with an abortion option notwithstanding the dangers presented to Kelly Hummel in continuing this pregnancy," and that Dr. Reiss had "failed to take appropriate steps to arrange

proper medical treatment under the circumstances." The complaint alleged further that defendants had "departed from accepted standards of medical care in their treatment for Kelly Hummel * * *." She filed an amended complaint on May 5, 1989, that phrased the breach of duty in terms of a duty to "Judy and Kelly Hummel" and added the assertion that defendants had breached a duty by not informing Judy Hummel of her right to be transferred to a hospital that would perform an abortion.

The trial court granted separate motions by Dr. Reiss and the hospital for, respectively, dismissal of the complaint for failure to state a claim on which relief can be granted and for summary judgment. In affirming, the Appellate Division reasoned that although a therapeutic abortion—one that is performed to preserve the mother's health—was legally available to Judy Hummel, she had not been harmed in any way by the failure to have undergone that procedure, and that a eugenic abortion—one that terminates a pregnancy to avoid the birth of a severely-deformed child—was not legally available in 1971. 247 *N.J.Super.* 502, 504, 589 *A.*2d 1041 (1991).

## II

The first case in which we addressed a claim by a child based on negligence to its then-pregnant mother was *Gleitman v. Cosgrove,* 49 *N.J.* 22, 227 *A.*2d 689 (1967). In *Gleitman,* the defendant-doctor had failed to inform the child's mother of the effect that rubella, which she had suffered early in her pregnancy, would have on the fetus. (Rubella, or German measles, is a mild childhood disease that when contracted in the early stages of pregnancy can cause severe damage to the fetus, resulting in devastating birth defects. 5 *Lawyers' Medical Cyclopedia of Personal Injuries and Allied Specialties,* § 37.-11a (Charles J. Frankel et al. eds., 5th ed. 1986) (hereinafter *Medical Cyclopedia* ).) Her son was born with severe defects in sight, hearing, and speech. *Id.* at 24–25, 227 *A.*2d 689.

The Gleitmans sued both on their own behalf and on behalf of their impaired son. They alleged that had they known that their son might be born so severely impaired, they would have sought other medical advice with a view to the obtaining of an abortion. *Id.* at 26, 227 *A.*2d 689. We gave two reasons for deciding that neither the parents nor the infant had stated a cognizable claim. First, a damage calculation was impossible because it involved measuring "the difference between [the boy's] life with defects against the utter void of nonexistence * * *." *Id.* at 28, 227 *A.*2d 689. Second, to prevail, the infant plaintiff would have had to allege that he would have been better off not being born than being born with his impairments. *Ibid.* We rejected that premise, concluding that life with defects was better than no life at all. *Id.* at 30, 227 *A.*2d 689.

After the Supreme Court's decision in *Roe v. Wade, supra,* 410 *U.S.* 113, 93 *S.Ct.* 705, 35 *L.Ed.*2d 147, which established a woman's qualified right to terminate her pregnancy, this Court recognized causes of action of both parents and infants harmed by doctors' negligence in failing to inform parents of conditions that would bear on informed choice regarding whether to carry the pregnancy to full term. In a trilogy of cases discussed below, we recognized causes of action for wrongful birth (the parents' claims resulting from the birth of a severely-deformed child) and wrongful life (the child's claim for having been born with the deformity).

In the first of those cases, *Berman v. Allan,* 80 *N.J.* 421, 404 *A.*2d 8 (1979), we recognized a cause of action for wrongful birth. That case centered around the defendant-physicians' failure to advise a thirty-eight-year-old woman to undergo amniocentesis. (Amniocentesis is a procedure in which a long needle is inserted into the uterus to obtain a sample of the amniotic fluid. The procedure can signal the presence of chromosomal abnormalities, including Down's Syndrome, and of other potential problems. The procedure is considered advisable for women over the age of forty, and many doctors recommend it for women over the age of thirty-five. 5 *Medical*

*Cyclopedia, supra,* at § 37.5j.) Her child was born with Down's Syndrome. We held that the parents had a cause of action because the mother had been deprived of the opportunity to choose whether to abort the fetus, *id.* at 431–32, 404 *A.*2d 8, but we rejected the infant's wrongful-life claim because the child had "not suffered any damage cognizable at law by being brought into existence," *id.* at 429, 404 *A.*2d 8.

The parents had requested damages to compensate both for the medical and other costs of raising the child and for emotional distress. *Id.* at 431, 404 *A.*2d 8. We rejected the former items of damages because of the benefits the parents would receive from the birth of the child—"the love and joy they will experience as parents"—and because the award of such damages was disproportionate to the doctors' negligence, giving the parents a windfall and unduly burdening physicians. *Id.* at 432, 404 *A.*2d 8.

In the second case, *Schroeder v. Perkel,* 87 *N.J.* 53, 432 *A.*2d 834 (1981), this Court allowed successful wrongful-birth claimants to recover the extraordinary medical expenses of raising their child. *Id.* at 66–71, 432 *A.*2d 834. (The infant plaintiffs had not appealed the trial court's dismissal of their claims.) The alleged negligence involved a failure to diagnose cystic fibrosis in the Schroeders' child Ann, thereby depriving them of the choices of whether to conceive a second child and whether to terminate the pregnancy. Cystic fibrosis is an incurable genetically-transmitted disease that causes, among other symptoms, severe respiratory problems and an inability to digest fats. It cannot be detected in a fetus but is easily detected after birth. Cystic-fibrosis victims usually die in their late teens. *Id.* at 58–59, 432 *A.*2d 834. When the disease was detected in Ann, Mrs. Schroeder was in her eighth month of pregnancy with a second child, Thomas, who also fell victim to the disease. *Id.* at 60, 432 *A.*2d 834.

The trial court denied the defendants' summary-judgment motion directed to the plaintiffs' demand for extraordinary medical expenses, and the Appellate Division reversed. We

reversed, and held that if the parents prevailed on remand, they would be entitled to compensation for the costs they had incurred as a result of Thomas's cystic fibrosis. *Id.* at 70–71, 432 *A*.2d 834. We distinguished *Berman* by noting that "Mr. and Mrs. Schroeder will receive no compensating pleasure from incurring extraordinary medical expenses on behalf of Thomas. There is no joy in watching a child suffer and die from cystic fibrosis." *Id.* at 69, 432 *A*.2d 834.

In the third case, *Procanik v. Cillo, supra,* 97 *N.J.* 339, 478 *A*.2d 755, we recognized the child's cause of action for wrongful life, and held that a child may recover the lifetime extraordinary expenses resulting from a misdiagnosis that deprived its parents of the choice of terminating the pregnancy. We began our analysis by noting that a doctor's duty to a pregnant woman extends to the infant. *Id.* at 348–51, 478 *A*.2d 755. Having decided that, we concluded that the items of wrongful-birth damages we had approved in *Schroeder, supra,* 87 *N.J.* 53, 432 *A*.2d 834, were equally available in wrongful-life claims. 97 *N.J.* at 351–52, 478 *A*.2d 755. We concluded that the parents or the child can recover damages for extraordinary expenses incurred while the child was a minor, and that the child is entitled to similar damages during majority. *Id.* at 352, 478 *A*.2d 755. We also repudiated the logic that had supported the denial of the wrongful-life cause of action in *Gleitman, Berman,* and *Schroeder:*

> Our decision to allow the recovery of extraordinary medical expenses is not premised on the concept that non-life is preferable to an impaired life, but is predicated on the needs of the living. We seek only to respond to the call of the living for help in bearing the burden of their affliction.
>
> [*Id.* at 353, 478 *A*.2d 755.]

Plaintiff attempts to take the wrongful-life cause of action one step further and apply it to a situation that predates the recognition of the legal right to obtain a eugenic abortion.

### III

Plaintiff's appeal raises two issues: (1) whether a child born before *Roe v. Wade, supra,* 410 *U.S.* 113, 93 *S.Ct.* 705, 35

*L.Ed.*2d 147, can recover on a claim for wrongful life, and (2) whether the duty to perform a therapeutic abortion extends beyond the mother to include the child. We answer both questions in the negative, and therefore conclude that plaintiff's complaint does not state a claim on which relief can be granted.

In 1971, when Kelly was born, the United States Supreme Court had not yet decided *Roe v. Wade,* and this Court had not yet recognized a cause of action for wrongful life. The only case in which we had confronted the issue at that time was *Gleitman, supra,* 49 *N.J.* 22, 227 *A.*2d 689. Despite that fact, plaintiff argues that *Procanik v. Cillo, supra,* 97 *N.J.* 339, 478 *A.*2d 755, "directly overruled" the "dated" reasoning of *Gleitman,* and therefore the trial court erred in basing its dismissal on *Gleitman.*

However, plaintiff overlooks a critical aspect of *Procanik:* that case leaves no doubt that its rule—as indeed is the case with *Berman* and *Schroeder*—is premised on the availability of lawful eugenic abortions. Therefore, the rule that *Procanik* established cannot be applicable to cases arising before the United States Supreme Court's opinion in *Roe v. Wade, supra,* 410 *U.S.* 113, 93 *S.Ct.* 705, 35 *L.Ed.*2d 147. Although *Procanik* superseded our refusal in *Gleitman* to allow an infant to recover for defects caused by a doctor's malpractice in treating the mother, our reasoning in *Procanik* does not support plaintiff's contention that it applies to events predating *Roe v. Wade.* Neither in *Procanik* nor in any other case did we expressly overrule *Gleitman.*

The Court in *Procanik* recognized the change in the legal landscape during the seventeen years between *Gleitman* and *Procanik.* The most significant development in that period was the United States Supreme Court's holding in *Roe v. Wade,* which recognized the constitutional right of women "to choose to terminate a pregnancy." *Procanik, supra,* 97 *N.J.* at 346, 478 *A.*2d 755. In *Procanik* we acknowledged that "[r]ecogni-

tion of that right by the high court subsequently influenced this Court in *Berman v. Allan.*" *Ibid.* (citation omitted). Indeed, we based our reasoning in *Berman, supra,* on the change in law that *Roe* had wrought: "The Supreme Court's ruling in *Roe v. Wade* clearly establishes that a woman possesses a constitutional right to decide whether her fetus should be aborted * * *. Public policy now supports, rather than militates against, the proposition that she not be impermissibly denied a[n] * * * opportunity to make that decision." 80 *N.J.* at 431–32, 404 *A.*2d 8 (citation omitted).

The breaches of duty in *Procanik, Berman,* and *Schroeder* all revolve, at least in part, around the defendant-doctor's failure to diagnose a condition that might have caused the parents to terminate the pregnancy had they been informed of that condition. The wrongful-life and -birth causes of action are, therefore, dependent on a woman's right to terminate a pregnancy for reasons other than the mother's health.

Before *Roe v. Wade* expanded the right to choose, however, women could obtain only therapeutic abortions. *Gleitman, supra,* 49 *N.J.* at 31, 227 *A.*2d 689; *accord Planned Parenthood v. State,* 75 *N.J.* 49, 53, 379 *A.*2d 841 (1977). In *Gleitman* the Court observed that "[a] child need not be perfect to have a worthwhile life," 49 *N.J.* at 30, 227 *A.*2d 689, and found that "[e]ugenic considerations are not controlling," *ibid.,* noting that considerations of financial burden to the father and convenience of the mother did not outweigh the child's right to live, albeit imperfectly. *Id.* at 30–31, 227 *A.*2d 689. Moreover, this Court has expressly held that *Roe v. Wade* is not entitled to retroactive application. See *Planned Parenthood v. State, supra,* 75 *N.J.* at 52, 379 *A.*2d 841.

(We need not resolve in this case whatever dispute remains over whether a therapeutic abortion was available to preserve only the mother's life or to preserve her health as well. *Compare Gleitman,* 49 *N.J.* at 31, 227 *A.*2d 689 ("The only justification so far held lawful by our courts is preservation of the

mother's life.") *with Hummel v. Reiss, supra,* 247 *N.J.Super.* at 504, 589 *A.*2d 1041 (therapeutic abortion was available to Judy Hummel "because her health, indeed perhaps her life, was threatened by her complicated pregnancy in 1971"). A decade ago we noted that the right to an abortion to safeguard the health of the mother, like that to preserve her life, is protected under the New Jersey Constitution. See *Right to Choose v. Byrne,* 91 *N.J.* 287, 305–07, 450 *A.*2d 925 (1982).)

In 1971, then, when Kelly Hummel was born, the state of the law was such that the defendants in *Berman, Schroeder,* and *Procanik* could not have been liable. Even had the respective doctors diagnosed Down's Syndrome (*Berman*), cystic fibrosis (*Schroeder*), or rubella (*Gleitman, Procanik*), the parents of the impaired children would have had no recourse: no abortion was legally available to them in New Jersey.

## IV

Plaintiff claims that the failure to perform a therapeutic abortion breached a duty to the severely-impaired infant whose birth resulted. We stress that plaintiff concedes that eugenic abortions were not legally available in 1971.

Relying on *Procanik,* plaintiff asserts that "the right to a therapeutic abortion gave rise to the dual duty to both the mother and the child—even where the birth date was pre-*Roe v. Wade.*" That claim misreads the dual-duty theory that *Procanik, Berman,* and *Schroeder* established, and underestimates the effect that *Roe v. Wade* had on this area of the law. The significance of the wrongful-life and -birth cases is that the defendant's breach of duty deprived the mother of the choice to terminate her pregnancy. Judy Hummel had no such choice.

Writing separately in *Berman v. Allan, supra,* Justice Handler found a duty to the unborn child and thus would have allowed the infant plaintiff to recover under a wrongful-life theory. 80 *N.J.* at 434, 404 *A.*2d 8 (Handler, J., concurring in part and dissenting in part). Even so, he based that duty on

the legality of eugenic abortions. In discussing the wrongful-birth claim, he noted that since *Gleitman* the law had changed to drop "the legal barriers to early abortion." *Id.* at 436, 404 A.2d 8. Justice Handler noted the importance of *Roe v. Wade* to wrongful-life analysis even more forcefully in his separate opinion in *Procanik, supra:* "We should recognize that the wrongful deprivation of the individual choice either to bear or not to bear a handicapped child is a tort—to the infant as well as the parents * * *." 97 *N.J.* at 358, 478 A.2d 755 (Handler, J., concurring in part and dissenting in part). No such "individual choice" existed in 1971, however. The only choice was whether to terminate a pregnancy in order to preserve the mother's health.

To hold that the failure to perform a therapeutic abortion on the mother, Judy Hummel, breached a duty to the child, Kelly Hummel, would contort the law of negligence. An actor has a duty to guard against harm that he or she could reasonably foresee. "If one could not reasonably foresee any injury as the result of one's act, or if one's conduct was reasonable in the light of what one could anticipate, there would be no negligence, and no liability." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts*, § 43, at 280 (5th ed. 1984) (hereinafter *Prosser*). Severe birth defects not caused by the defendant-doctor were not, in 1971, a foreseeable injury when the only alternative to birth with those defects was no birth at all. Indeed, the opposite is true: such a birth was not considered to be an injury at all because the law in New Jersey was that any life was better than none. *Gleitman, supra,* 49 *N.J.* at 30, 227 A.2d 689.

Furthermore, framing the duty to perform a therapeutic abortion as one to prevent the birth of a handicapped child would fly in the face of criminal law as it existed in 1971. The abortion statute in effect in 1971 provided as follows:

Any person who, maliciously or without lawful justification, with intent to cause or procure the miscarriage of a pregnant woman, administers or prescribes or advises or directs her to take or swallow any poison, drug, medicine

or noxious thing, or uses any instrument or means whatever, is guilty of a high misdemeanor.

If as a consequence the woman or child shall die, the offender shall be punished by a fine of not more than $5,000, or by imprisonment for not more than 15 years, or both.

[*N.J.S.A.* 2A:87–1, *repealed by* Act effective Sept. 1, 1979, ch. 95, 1978 N.J. Laws 482, 687–88 (codified at *N.J.S.A.* 2C:98–2).]

When we decided *Gleitman,* the only "lawful justification" for abortion was "preservation of the mother's life." 49 *N.J.* at 31, 227 *A.*2d 689. All parties agree that that was the law when Kelly Hummel was born in 1971. The doctor's duty in deciding whether to perform a therapeutic abortion was to the mother, and to the mother alone. Consideration of any other factor could have opened the doctor to criminal sanctions.

Dr. Reiss's only duty was to protect Judy Hummel's life. He owed no duty to ensure that Kelly was not born; his only duty to Kelly was to do all in his power to ensure her birth. Judy was gravely ill, perhaps even to the point of being in mortal danger, and a therapeutic abortion most likely would have been within the strictures of the anti-abortion statute. However, no legally-cognizable claim against either the hospital or the physician arises from any failure by Dr. Reiss to perform such an abortion. The harm that a therapeutic abortion would have addressed was Judy Hummel's death; however, the patient emerged from her hospitalization with her health intact. (Moreover, any claim that Judy might have had against the physician and hospital is time-barred. See *N.J.S.A.* 2A:14–2.)

To accept Kelly Hummel's claim that the failure to perform a therapeutic abortion on Judy breached a duty to Kelly would create an inequity. In *Gleitman, supra,* 49 *N.J.* 22, 227 *A.*2d 689, we expressly rejected a wrongful-life cause of action. We continued to reject such claims until our 1984 decision in *Procanik, supra,* 97 *N.J.* 339, 478 *A.*2d 755, and even in that case we recognized the importance of *Roe v. Wade* to our holding. Therefore, persons born before the decision in *Roe* are foreclosed from receiving the benefits of such a claim. To allow some of them to benefit from a wrongful-life recovery simply because their mothers' lives had been sufficiently endan-

gered to warrant consideration of a therapeutic abortion would be an arbitrary denial of relief to equally-damaged persons, based only on a fortuity.

## V

Because the rule of *Procanik v. Cillo, supra,* 97 *N.J.* 339, 478 *A.*2d 755, does not apply to cases arising before the Supreme Court's decision in *Roe v. Wade, supra,* 410 *U.S.* 113, 93 *S.Ct.* 705, 35 *L. Ed.*2d 147, and because a duty to perform a therapeutic abortion on a mother does not create a duty to abort her child, we conclude that Kelly Hummel has not stated a cause of action on which relief can be granted. Therefore, we affirm the Appellate Division judgment upholding the trial court's dismissal of the complaint.

HANDLER, J., dissenting.

This case returns us to our longstanding struggle to explain and define the limits of tort actions by handicapped children born as the result of medical malpractice. Since 1967 when the Court first considered whether the failure to warn parents that their child would be born with serious birth defects gave rise to tort damages, the problem of valuing life against non-existence has perplexed the Court. That parents denied the opportunity to terminate a pregnancy can collect damages for pain and suffering and that both parents and children can recover extraordinary medical expenses are now settled. Nonetheless, although our treatment of these actions has evolved significantly, this case demonstrates that the metaphysical and logical tangles inherent in this area of law continue to stand in the way of alleviating the crushing burdens placed on families as the foreseeable result of medical malpractice.

I dissent based on my conclusion that the majority here takes an unnecessary step back from our decision in *Procanik v. Cillo,* 97 *N.J.* 339, 478 *A.*2d 755 (1984). In *Procanik* we held that children with severe birth defects born as the result of

medical malpractice could recover special damages for their extraordinary medical expenses. The majority holds that plaintiff has no cause of action for medical expenses under *Procanik* because she was born before the Supreme Court decided *Roe v. Wade* in 1973.

The majority decision is based largely on the reasoning that prior to *Roe v. Wade* public policy in New Jersey valued life over non-existence. *Ante* at 126; *Gleitman v. Cosgrove,* 49 *N.J.* 22, 30, 227 *A.*2d 689 (1967). The majority decision does not deny the manifest conclusion that absent medical malpractice, the child would not have been born. The facts alleged clearly support a finding that the mother's life was in danger; that evacuating her uterus was an appropriate and lawful medical option; and that had it been carried out, the fetus would not have survived. The majority's holding is not based on the conclusion that Judy Hummel had no choice but to proceed with the pregnancy, but rather on the reasoning that whatever choice she did have could have been justified only by the goal of protecting her life or health. Because she did not yet have the right granted in *Roe v. Wade* to abort the fetus to prevent the birth of a severely handicapped child, she could not maintain an action against her doctor or hospital for denying her *that* choice. *Ante* at 127–28.

I would hold that when medical malpractice results in the birth of a severely handicapped child who would not otherwise have been born or where such malpractice denies a parent an actual choice to decide whether to proceed with a pregnancy, those responsible are liable for the foreseeable damages. The duty of medical professionals is to assure that patients control the course of their treatment. To the extent that medical professionals ignore the choices of patients or deny patient actual choices, they are responsible for the foreseeable results. To collect special damages plaintiffs must necessarily prove that absent malpractice, the child would not have been born. In cases arising before *Roe v. Wade* proof of causation and foreseeability is more difficult because abortions were available

under far more limited circumstances. Nonetheless, where a plaintiff can demonstrate that an abortion was an available medical option denied by malpractice, recovery should be allowed.

## I

The case comes before the Court on a dismissal for failure to state a claim, and therefore the allegations must be accepted as true and accorded the benefit of all reasonable inferences. *Portee v. Jaffee,* 84 *N.J.* 88, 90, 417 *A.*2d 521 (1980). The facts that plaintiff alleges support two possible theories of medical malpractice. The applicable standard of care may have required immediate evacuation of Judy Hummel's uterus when it was discovered that she was carrying a second fetus. The other possibility is that there was more than one acceptable course of action but that Hummel was denied the opportunity to choose how she would be treated.

Hummel entered St. Michael's Hospital on October 1, 1971, with vaginal bleeding and a 103 degree temperature. The next day she gave birth to a macerated stillborn fetus. Her treating physician, Dr. Reiss, told her that if she did not deliver the placenta shortly, he would perform a D & C operation to clear the uterus. As the day went on, the placenta did not appear and her condition worsened. Using an x-ray Reiss determined that a second fetus remained in the uterus.

At that point Hummel had a intrauterine infection, which threatened her life. According to Reiss, "The presence of the fetus in the uterus was a danger to her well-being. Good medicine dictated that the fetus be removed from the uterus to aid her recovery. However, under no circumstances did this mean the fetus had to be destroyed." Reiss, who settled with plaintiff and is no longer a defendant, asserts that there were three treatment options at that point. He could clear the uterus immediately, either through a caesarean section or the use of a drug called Pitocin, or he could wait for the child to

develop and deliver it vaginally. The fetus would not have survived either of the first two options.

Hummel was aware that her condition posed a danger to her life. She also claims that Reiss told her that if the fetus were delivered at some future point and survived, it would probably be very handicapped. She and her now-deceased husband resolved that her uterus should be evacuated and the pregnancy aborted.

At that point the hospital intervened. After a series of meetings among members of the medical and administrative staff, certain priests and probably her husband, a decision was made to leave the fetus in her uterus and wait for it to develop in order to give it a chance to live. Hummel did not participate in that decision. In the meantime her condition worsened, to the extent that she received the Last Rites of the Roman Catholic Church. When "the decision to continue her pregnancy was revealed to her, she was upset but did nothing" believing that she had no other choice. *Hummel v. Reiss*, 247 *N.J.Super.* 502, 506–07, 589 *A.*2d 1041 (App.Div.1991).

On October 13th, Reiss delivered the child vaginally. Born after twenty-five weeks of gestation, Kelly weighed one pound eleven ounces. Judy Hummel left the hospital two days after giving birth, and recovered physically. The child was born with severe physical and neurological damage and remained at the hospital for three months. The child is now a twenty-year old woman with psychomotor retardation, multiple handicaps, neurological impairments, and blindness. She lives at home with her mother and siblings.

When viewed most favorably to plaintiff, the allegations support the conclusion that the failure to evacuate the uterus immediately breached the applicable standard of care. According to her proffered expert, "evacuation of the uterus including the second fetus even in the second trimester was required in the septic situation for the benefit of the mother." Therefore unlike our previous cases, which involved a failure to warn of

likely birth defects, the facts of this case suggest that the failure to abort itself may have constituted malpractice. Moreover, even if the treatment option selected was consistent with applicable standards of care, the failure to inform Hummel about the options or allow her preference to be determinative may have constituted malpractice.

## II

The outcome of this case depends in large measure on whether Judy Hummel was denied an opportunity to abort her pregnancy. That question and implications that follow from the answer in turn depend on the nature of the duties owed to Hummel by the medical professionals involved in her treatment.

The right of competent adults fully to control the course of their medical treatment is well established. *In re Conroy,* 98 *N.J.* 321, 346, 486 *A.*2d 1209 (1985); *Perna v. Pirozzi,* 92 *N.J.* 446, 457 *A.*2d 431 (1983). That right to self-determination applies equally to the decision to operate and to the rejection of a course of action. *Id.* 98 N.J. at 347, 486 *A.*2d 1209. Neither physicians nor hospitals may override or ignore the choices of patients or their guardians, nor may either withhold information essential to their informed consent. *Cf. Strachan v. John F. Kennedy Memorial Hosp.,* 109 *N.J.* 523, 538 *A.*2d 346 (1988) (*Strachan*) (holding hospital liable, when in order to preserve organs of brain-dead child, it refused parents' demand that child be taken off life-support).

The right of patients to make subjective treatment decisions presupposes that they be told about and understand the available options and have all the relevant information necessary to make an informed choice. *Id.* 98 *N.J.* at 347, 486 *A.*2d 1209. By allowing parents and children to recover damages when births occur as the result of inadequate genetic screening or a failure to diagnose, the Court recognizes that the duty to inform is expansive. *Schroeder v. Perkel,* 87 *N.J.* 53, 63, 432 *A.*2d 834 (1981). Indeed, the duty to obtain and pass on

relevant information is coextensive with the reasonable foreseeability of the consequences of a failure to do so. *Id.* at 63, 432 *A.*2d 834. Although the failure to provide essential information can do independent harm, *Procanik, supra,* 97 *N.J.* at 361, 478 *A.*2d 755 (Handler, J., concurring in part and dissenting in part), the primary effect of such a failure is to deprive patients of a meaningful opportunity to control their treatment.

Dr. Reiss stated that when the second fetus was discovered in Hummel's uterus, he had to make a difficult decision about which course of treatment to pursue. Under accepted medical practices and legal principles, however, such a decision necessarily rested with Hummel, not with her doctor or her hospital. To suggest that the doctor's duty in deciding whether to perform an abortion was owed to the mother alone begs the question. The doctor's duty was to inform the mother of the medical options and take informed direction from her. *See ibid.* ("it is the doctor's role to provide the necessary medical facts and the patient's role make the subjective treatment decision based on his understanding of those facts.")

The hospital shared with Dr. Reiss the duty to respect Hummel's right to control her treatment. As we have recognized in the context of terminally ill patient care, a patient does not lose "the right to choose among medical alternatives" when he or she enters a medical facility. *Matter of Jobes,* 108 *N.J.* 394, 425, 529 *A.*2d 434 (1987); *see also Strachan, supra,* 109 *N.J.* at 530, 538 *A.*2d 346 (recognizing hospital's duty "to act reasonably in the face of plaintiff's request to turn over the [child's] body").

Even if the decision on which course of treatment to follow involved only an objective medical question of what would best promote her health, in the absence of an emergency, Hummel had the right to choose the treatment. In this case her participation was even more crucial because the decision on whether to abort or allow the fetus to develop further did not turn exclusively on her health. If her claims prove accurate, her

decision to have her uterus evacuated was overridden by the hospital on grounds that had nothing to do with her life or health. Her life apparently was put in greater risk in order that the child might live. We can only speculate at this point about the role that the child's potential handicaps played in the discussions that led to the ultimate decision.

Nonetheless, the decision clearly involved not only complicated medical judgements about the condition of both Hummel and the fetus, but also difficult moral questions involved in weighing the value of the mother's life against the potential life of the child. The decision may also have raised legal issues concerning the limits of abortion law at that time. *See, Gleitman, supra,* 49 *N.J.* at 56, 227 *A.*2d 689 (Weintraub, C.J., concurring and dissenting) (discussing whether abortion to prevent the birth of children with birth defects was lawful in 1967). Because the decision involved profound moral and personal issues, it was one that only Hummel could make. Given her right to be fully informed, she surely had the right to know the condition of the fetus she was carrying inside her womb. Once given that information she had the right to decide whether to undergo an abortion, and in making that decision the right to consider the implication of bringing a child to life with severe birth defects.

We recognized in *Procanik, supra,* that negligence in so-called "wrongful birth" and "wrongful life" cases is actionable because it "deprive[s] the parents of the choice of terminating the pregnancy and of preventing the birth of the infant plaintiff." 97 *N.J.* at 348–49, 478 *A.*2d 755. The choice denied Hummel was more complicated than that denied the parents in our previous cases. It pitted her life against the potential and potentially diminished life of her child. Whereas the choice to abort was denied the parents in our previous cases by negligent omissions, in this case medical personnel affirmatively took that choice away from Hummel. Moreover, the apparent malpractice here took place under the intense pressure of a medical emergency. Those differences, however, should not diminish

what is common to both situations: that a rightful choice involving difficult moral and practical considerations was taken from parents resulting in the birth of a severely-handicapped child.

The choice denied Hummel to terminate her pregnancy should not be viewed in the abstract. Even if women in New Jersey did not have the right as a general matter to chose abortion in 1971, Judy Hummel had the right to an abortion under the specific circumstances of her pregnancy. The availability of an abortion should have been explained to her by her physician. She should have been given the medical information necessary to make an informed decision with a full understanding of the implications of each option. Nothing in the pre-*Roe* statute or case law shifted medical decisions from patients to doctors or required that either have a pure heart or mind in making those decisions. If, after being fully informed, Hummel chose to have an abortion she should have either been provided one or been transferred to a hospital that would perform the appropriate treatment.

### III

In his dissent in *Gleitman,* Justice Jacobs called on the Court to acknowledge that malpractice committed against a pregnant woman caused harm not only to the woman but also to her family. 49 *N.J.* at 50, 227 *A.*2d 689. My own dissent in *Berman, supra,* elaborated on the familial character of the tort: "[T]he duty they owed Mrs. Berman enveloped a duty to the unborn child. The breach of that duty affects both." 80 *N.J.* at 444, 404 *A.*2d 8. In *Schroeder, supra,* a majority of the Court embraced the view that "a wrongdoer who causes a direct injury to one member of the family may indirectly damage another." 87 *N.J.* at 64, 432 *A.*2d 834. Justice Pollock wrote eloquently: "A family is woven of the fibers of life; if one strand is damaged, the whole structure may suffer. The filaments of family life, although individually spun, create a

web of interconnected interests." *Id.* at 63–64, 432 *A.*2d 834. Lastly, in *Procanik* we extended the web of protection to cover claims brought directly by handicapped children: "When a child requires extraordinary medical care, the financial impact is felt not just by the parents, but also by the injured child." 97 *N.J.* at 351, 478 *A.*2d 755. Although the doctor's traditional duty is to his or her patient, the Court recognized that that duty extends to the child as a family member who shares the burden of defendant's malpractice.

Until *Procanik* the Court could not fully reconcile itself with the idea that a child might have a negligence claim for having been wrongfully born. A majority of the Court had found impossible and even repugnant the measuring of the value of a life, even one seriously impaired, against the "utter void of nonexistence." *Berman, supra,* 80 *N.J.* at 427, 404 *A.*2d 8; *Gleitman, supra,* 49 *N.J.* at 28, 227 *A.*2d 689. Parents might maintain actions for wrongful birth but the children themselves were alive only by the grace of that negligence. How could they claim any damage? *Berman, supra,* 80 *N.J.* at 429, 404 *A.*2d 8.

In *Procanik, supra,* the Court recognized that allowing impaired children recovery is based not on metaphysics, "on the concept that non-life is preferable to an impaired life," but on "the needs of the living." 97 *N.J.* at 353, 478 *A.*2d 755. We said, "We seek only to respond to the call of the living for help in bearing the burden of their affliction." *Ibid.*

Although the Court in *Procanik* refused to allow impaired children the full measure of their damages, that decision nonetheless brought us full circle back to Justice Jacobs' original dissent in *Gleitman.* He had written there that "while logical objection may be advanced to the child's standing and injury, logic is not the determinative factor and should not be permitted to obscure that he has to bear the frightful weight of his [handicap] throughout life." 49 *N.J.* at 50, 227 *A.*2d 689. Echoing his words, Justice Pollock wrote for the Court in

*Procanik, supra,* that the "[l]aw is more than an exercise in logic, and logical analysis, although essential to a system of ordered justice, should not become an instrument of injustice." 97 *N.J.* at 351, 478 *A.*2d 755.

As with the children in our previous cases, Kelly Hummel, with her devastating birth defects, was born as the proximate and foreseeable result of medical malpractice. Both Dr. Reiss and St. Michael's Hospital owed a duty to Judy Hummel to respect her choices concerning treatment; that duty encompassed Kelly Hummel given an understanding of the familial nature at these torts and the fact that her birth was the predictable result of the defendants' negligence. After some struggle we have succeeded in seeing through the logical and metaphysical dilemmas inherent in evaluating these claim in order to focus on the central principles of tort law. *Schroeder, supra,* 87 *N.J.* at 65, 432 *A.*2d 834; *see also Berman, supra,* 80 *N.J.* at 432, 404 *A.*2d 8 ("As in all other cases of tortious injury, a physician whose negligence has deprived a mother of this opportunity should be required to make amends for the damage which he has proximately caused."). We hold persons liable for the proximate and foreseeable results of their negligence and do not immunize medical professionals from liability because the harm they cause, although measurable, implicates fundamental questions about life and death. There is no reason or justice in refusing to apply these same principles to the claim brought by Kelly Hummel.

IV

The majority would deny recovery notwithstanding the foreseeability of the harm and the extraordinary expenses visited on plaintiff and her family. It would do so because the malpractice was committed in 1971, two years before the United States Supreme Court decided *Roe v. Wade.* The reasoning that makes *Roe v. Wade* the determining factor in whether Kelly Hummel has a cause of action is sound. In 1971 parents

had no right to chose nonexistence over life. The birth of a child with severe birth defects was a matter of fate rather than choice. Because women had no choice to abort except to preserve their own health or life, the duty of a treating physician or hospital extended no further than to protect the health of the pregnant woman.

Although this approach has a certain logic, it does not do justice to the actual choice denied Judy Hummel nor to the overwhelming implications of the malpractice committed against her. Dr. Reiss and St. Michael's Hospital decided to bring Kelly Hummel into this world against the wishes of her parents. In doing so they violated standards of acceptable care and put Judy Hummel's life in danger. In overriding the decision of their patient, they either knew or should surely have known that Kelly would be born with devastating birth defects. That defendants should be able to make such a decision and bear none of the profound emotional and ruinous financial consequences that result is not just.

That their negligence took place before *Roe v. Wade* was decided diminishes neither the wrongfulness of their conduct nor the immense medical costs associated with caring for Kelly. Kelly is denied recovery because hypothetically her mother could not have considered the possibility that Kelly would be born with birth defects in a decision that she was never allowed to make. Surely a triumph of logic over justice.

I would reverse and remand for trial on the issues of negligence, proximate causation, foreseeability, and damages.

*For affirmance*—Justices CLIFFORD·POLLOCK, O'HERN, and GARIBALDI—4.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices HANDLER and STEIN—3.