709 A.2d 281

STANLEY MICHELMAN, PLAINTIFF–APPELLANT, v. PAUL EHR-
LICH, M.D., EHRLICH & GOLDFARB, P.A., ROCHE BIOMEDI-
CAL LABORATORIES, AND MAYO MEDICAL LABORATORIES,
DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued March 17, 1998—Decided May 6, 1998.

Before Judges KEEFE, PAUL G. LEVY and WECKER.

*Bruce H. Nagel,* argued the cause for appellant (*Nagel Rice & Dreifuss,* attorneys; *Mr. Nagel,* of counsel and on the brief; *Robert H. Solomon,* on the brief).

*Mary Elizabeth Gazi,* argued the cause for respondents Paul Ehrlich, M.D. and Ehrlich & Goldfarb, P.A. (*Thomas B. Leyhane,* attorney; *Ms. Gazi,* on the brief).

*Phillip J. Duffy,* argued the cause for respondent Roche Biomedical Laboratories (*Gibbons, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Mr. Duffy* and *Mark S. Sidoti,* on the brief).

*Frank Fazio,* argued the cause for respondent Mayo Medical Laboratories (*Porzio, Bromberg & Newman,* attorneys; *D. Jeffrey Campbell,* of counsel; *Mr. Fazio,* of counsel and on the brief).

The opinion of the court was delivered by

KEEFE, J.A.D.

The issue to be decided is whether plaintiff, Stanley Michelman, may bring an action for his grandson's "wrongful birth."

This case involves a tragic incident in which plaintiff's grandson, Evan Ungerleider, was born afflicted with Tay–Sachs disease, a neurological disease that prevents the development of motor skills and is eventually fatal.[1]  In a separate action from the one now before this court, Evan, along with his parents, Jeff and Shari Ungerleider, have filed both "wrongful life" and "wrongful birth" causes of action, respectively, against defendants Paul Ehrlich, Ehrlich & Goldfarb, P.A., Roche Biomedical Laboratories, and Mayo Medical Laboratories (collectively, "the defendants").[2]  As of the filing of this appeal, that cause of action is pending in the Law Division.

Plaintiff's complaint, naming the same defendants, mirrors the parents' claim that defendants were negligent in failing to inform Shari Ungerleider of abnormalities in the fetus.  Plaintiff seeks to be compensated for defendants' negligence because he "has suffered and will continue to suffer severe emotional pain . . . due to his grandson Evan's crippling and fatal affliction."  Recognizing that a grandparent does not have a cognizable cause of action for "wrongful birth" under New Jersey law, plaintiff argued in the Law Division that a cause of action for "wrongful birth" in favor of a grandparent is a logical extension of extant Supreme Court precedent.  On defendants' motion, Judge Winard dismissed plain-

---

[1] The disease is characterized as,

a recessive disorder, with the gene carried most commonly in families of Eastern European Jewish origin.  Children who have the disease exhibit early, progressive and profound retardation, blindness and paralysis, with characteristic cherry red spots on the retina.  Death usually occurs by age three or four.  Diagnosis can be made in utero on the basis of examination of material obtained at amniocentesis.

[Lawyer's Medical Cyclopedia § 4.10 (3d ed. 1990).]

[2] The record indicates that Mayo has been released from this action by way of summary judgment.

tiff's complaint for failure to state a claim upon which relief can be granted. *R.* 4:6–2.

Plaintiff now appeals from that judgment. Conceding as he did before the Law Division that New Jersey law, as it now stands, does not provide a grandparent with a cognizable cause of action for "wrongful birth," plaintiff urges this court to "advance the frontier of family torts." Plaintiff argues that a grandparent is a "filament of family life," and the injury suffered by Evan affects the entire family unit; therefore, plaintiff contends that he should be able to bring an action against the defendants for the emotional damages he has suffered.

■ We affirm the decision of the Law Division and conclude that extension of the cause of action for "wrongful birth" in favor of a grandparent is inconsistent with our tort law and contrary to the principles undergirding that cause of action.

## I.

■ The concepts of "wrongful birth" and "wrongful life" are of recent vintage in our law. These actions generally arise where a doctor fails to diagnose or inform the parents that the child might be born with abnormalities in time to permit the parents to make the decision whether to terminate the pregnancy. *See Prosser and Keeton on Torts* 370 (5th ed.1984). While most jurisdictions allow parents to recover under a "wrongful birth" theory, a child's action for "wrongful life" has not been met with favor. *Id.* at 372; *see generally* Gregory Sarno, Annotation, *Recoverability of Compensatory Damages for Mental Anguish or Emotional Distress for Tortiously Causing Another's Birth*, 74 *A.L.R.*4th 798 (1989 and 1997 Supp.); Gregory Sarno, Annotation, *Tort Liability for Wrongfully Causing One to Be Born*, 83 *A.L.R.*3d 15 (1978 and 1997 Supp.).

In the first New Jersey case to address the issue of "wrongful birth," the Supreme Court rejected the claim, explaining that the "public policy supporting the preciousness of human life" and the

impossibility of measuring the damages of becoming parents of a defective child outweighed any countervailing interest the parents might have to emotional and monetary injuries. *Gleitman v. Cosgrove*, 49 *N.J.* 22, 29–31, 227 *A.*2d 689 (1967). The Court also rejected any claim for "wrongful life" on behalf of the infant, reasoning that the "Court cannot weigh the value of life with impairments against the nonexistence of life itself." *Id.* at 28, 227 *A.*2d 689.

In 1973, the Supreme Court of the United States decided *Roe v. Wade*, 410 *U.S.* 113, 93 *S.Ct.* 705, 35 *L.Ed.*2d 147 (1973), recognizing a woman's constitutional right to terminate her pregnancy. That decision determined that a woman, at least during the first trimester of pregnancy, has a privacy right to abort the fetus without state interference. Recognizing the "changes in the law which have occurred in the 12 years since *Gleitman*," and the impact the decision in *Roe v. Wade* had on the rationale of *Gleitman*, the New Jersey Supreme Court in *Berman v. Allan*, 80 *N.J.* 421, 404 *A.*2d 8 (1979) overruled *Gleitman* and held that "wrongful birth" is a cognizable cause of action in New Jersey.

In *Berman*, the parents of an infant born with Down's Syndrome brought a cause of action individually, as well as on behalf of the child as her guardians *ad litem*, against doctors who allegedly failed to inform Mrs. Berman of the procedure known as amniocentesis. *Id.* at 424, 404 *A.*2d 8. The complaint alleged that if Mrs. Berman had been informed about the procedure, she would have had the test, discovered that the child, if born, would be afflicted with Down's Syndrome, and would have aborted the fetus. *Id.* at 425, 404 *A.*2d 8.

First, the Court rejected the infant's "wrongful life" claim. Basing its decision on grounds similar to *Gleitman*, the Court held that public policy mandates that the sanctity of human life, even if in an impaired state, be preferred over nonexistence. Thus, a claim stating that the infant "would be better off had she never been brought into the world" at all could not be maintained. *Id.* at 430, 404 *A.*2d 8.

As to the parents' claim for "wrongful birth," however, the Court held that such an action was cognizable. *Id.* at 430–34, 404 *A.*2d 8. According to the Court, in light of *Roe v. Wade* a woman cannot be denied, at least in the first trimester of pregnancy, a meaningful opportunity to have an abortion. *Id.* at 432, 404 *A.*2d 8. Corresponding with this right, then, is the remedy of making amends for the damage proximately caused by "a physician whose negligence has deprived a mother of this opportunity." *Ibid.* "Any other ruling," the Court noted, "would in effect immunize from liability those in the medical field providing inadequate guidance to persons who would choose to exercise their constitutional right to abort fetuses which, if born, would suffer from genetic defects." *Ibid.* Consequently, the Court held that "Mr. and Mrs. Berman have stated actionable claims for relief," and, while denying the parents damages for medical expenses, the parents may be compensated "for the mental and emotional anguish that they have suffered and will continue to suffer on account of (the infant's) condition." *Id.* at 433–34, 404 *A.*2d 8.

Since *Berman* the Court has twice revisited the issue. Two years later in *Schroeder v. Perkel,* 87 *N.J.* 53, 432 *A.*2d 834 (1981), the Court expanded the tort to include the parents' recovery for medical expenses required by the child. *Id.* at 65, 432 *A.*2d 834. Interestingly, in addition to expanding the parents' basis for recovery, the *Schroeder* Court also decided to "reanalyze" the rationale for the "wrongful birth" cause of action in terms of a traditional tort duty analysis. *Id.* at 62, 432 *A.*2d 834 (explaining that in determining the rights and duties of the parties in a "wrongful birth" case, courts must consider whether the defendant physicians or medical staff owed a duty to the parents to diagnose and inform them of an abnormality in the child).

In *Schroeder,* parents brought suit against defendant physicians for negligently failing to diagnose cystic fibrosis in their first child. The complaint alleged that because the doctors did not make them aware they were carriers of cystic fibrosis, they were deprived of an informed decision whether to have their second child. *Id.* at

57, 432 A.2d 834. In passing on the propriety of the parents' claim, the Court, while not abandoning the rationale set forth in *Berman, see id.* at 67, 432 A.2d 834 (recognizing that the creation of the "wrongful birth" cause of action was "in part because of the constitutional right of a woman to abort a pregnancy"), chose to analyze this case under the concepts of negligence and tort duty. *Id.* at 62–66, 432 A.2d 834. Applying traditional tort duty principles, and reaching the conclusion that physicians have a duty to disclose material information to the parents that would help inform their decision whether to terminate a pregnancy, the Court reasoned that it is foreseeable that such negligence would cause legal damage, both in terms of emotional damages and certain medical expenses. *Id.* at 65, 432 A.2d 834. On the issue of foreseeability, the Court recognized that "foreseeability of injury to members of a family other than the one immediately injured[,] [i.e., the child,] by the wrongdoing of another must be viewed in light of the legal relationships among family members." *Id.* at 63, 432 A.2d 834. Showing the legal connection between the physicians' wrongdoing and the parents' harm in this case, the Court explained that a physician's duty "may extend beyond the interests of a patient to members of the immediate family of the patient who may be adversely affected by a breach of that duty." *Id.* at 65, 432 A.2d 834. According to the Court, "[f]oreseeability of harm to parents from an injury to a child flows not only from the bonds between parent and child, but also from the responsibility of parents to provide medical care for their children." *Id.* at 64, 432 A.2d 834.

Three years later in *Procanik by Procanik v. Cillo,* 97 N.J. 339, 478 A.2d 755 (1984), the Court for the first time recognized a limited action in favor of an infant for "wrongful life." In *Procanik,* both the infant and his parents brought claims against physicians who were allegedly negligent in failing to diagnose and inform Mrs. Procanik that she had contracted German measles during the first trimester of her pregnancy. *Id.* at 342, 478 A.2d 755. After giving birth to the child with birth defects, and discovering that they had a potential cause of action against the doctors, the Procaniks waited three years to bring an action. *Id.*

at 344, 478 *A*.2d 755. The trial court ruled that the parents' complaint was time barred. *Ibid.*

On certification to the Supreme Court, the Court first analyzed the infant's "wrongful life" claim. In doing so, the Court made a clear distinction between an infant's claim for emotional damages and a claim for extraordinary medical expenses. With regard to the infant's claim for emotional damages, the Court remained steadfast in its position that no such cause of action is recognized under New Jersey law. *Id.* at 353, 478 *A*.2d 755. The Court reiterated the "philosophical problem of finding that . . . a defective life is worth less than no life at all." *Ibid.* However, as to the infant's claim for extraordinary medical expenses, this case presented the Court with a perplexing problem. Because the parents' "wrongful birth" claim was time barred, the court was faced with the difficult decision of either denying recovery for medical expenses entirely or overruling *Gleitman* and *Berman* to the extent that those decisions rejected a claim for medical expenses on behalf of the infant. The Court chose the latter option.[3]

Analyzing the cause of action under negligence and duty standards, and finding that the doctors owed the infant a duty, *id.* at 348, 478 *A*.2d 755, the Court reasoned that its decision to allow the infant to bring a cause of action for extraordinary medical expenses, where the parents could not, was a response "to the call of the living for help in bearing the burden of their affliction." *Id.* at

---

[3] In justifying the Court's departure from *Gleitman* and *Berman*, Justice Pollock wrote:

> Law is more than an exercise in logic, and logical analysis, although essential to a system of ordered justice, should not become an instrument of injustice. Whatever logic inheres in permitting parents to recover for the cost of extraordinary medical care incurred by a birth-defective child, but in denying the child's own right in recovering those expenses, must yield to the inherent injustice of that result. The right to recover the often crushing burden of extraordinary expenses visited by an act of medical malpractice should not depend on the "wholly fortuitous circumstances of whether the parents are available to sue."

[*Id.* at 351–52, 478 *A*.2d 755 (citation omitted).]

353, 478 *A.*2d 755. In so finding, the Court noted that "[w]hen a child requires extraordinary medical care, the financial impact is felt not just by the parents, but also by the injured child." *Id.* at 351, 478 *A.*2d 755. Therefore, the Court concluded that "a child or his parents may recover special damages for extraordinary medical expenses incurred during infancy, and that the infant may recover those expenses during his majority." *Id.* at 352, 478 *A.*2d 755. In reaching this conclusion, the Court expressly noted that the infant's claim for medical expenses was "separate" from the parents' claim for pain and suffering. *Id.* at 356, 478 *A.*2d 755. Thus, the parents' time barred claim could not be resuscitated by the child's claim. *Id.* at 355–56, 478 *A.*2d 755.

■ Read together, *Berman, Schroeder,* and *Procanik* define the scope of "wrongful birth" and "wrongful life" actions in New Jersey. As the law now stands, parents of an infant are the only persons who may recover for general pain and suffering damages, and either the parents or the infant, not both, may recover for the costs of medical care.

Against this backdrop, this case presents the issue of whether the "wrongful birth" cause of action should be extended to grandparents. The plaintiff and defendants in this case treat the Court's differing rationales in *Berman* and *Schroeder* as being mutually exclusive of each other. In support of the argument that the creation of a "wrongful birth" cause of action only resides with the parents, defendants argue that the court should only consider plaintiff's claim in terms of the mother's right to terminate the pregnancy. In making this argument, however, defendants fail to analyze plaintiff's claim under traditional concepts of tort duty as the Court did in *Schroeder* and *Procanik.* In contrast, the plaintiff argues that the court should consider the present claim under concepts of tort duty without recognizing that the impetus for creating the duty in *Berman* was grounded in the woman's recognized constitutional right to terminate her pregnancy. *See Hummel v. Reiss,* 129 *N.J.* 118, 125, 608 *A.*2d 1341 (1992) (explaining that the critical aspect of the creation of a "wrongful birth"

cause of action "is premised on the availability of lawful eugenic abortions").

Despite the parties' arguments, we believe that it would be unsound to evaluate plaintiff's claim under either rationale in isolation. Rather, we must evaluate plaintiff's claim under traditional concepts of tort duty, while at the same time recognizing that the "wrongful birth" cause of action had its genesis in *Roe v. Wade* 's acknowledgement of a woman's right to terminate her pregnancy. Our research has revealed no reported decision in the country which addresses the issue now before the court. *See Recoverability of Compensatory Damages, supra,* 74 *A.L.R.*4th 798; *Tort Liability for Wrongfully Causing One to Be Born, supra,* 83 *A.L.R.*3d 15.

## II.

It is fundamental in the law that in order for a person to have a legally cognizable cause of action, it must first be demonstrated that the plaintiff has a protected right that has been violated. *Prosser and Keeton, supra,* at 236. As Prosser and Keeton describe it, the determination is "whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant." *Ibid.* The issue of whether a legal duty should be imposed requires a careful balancing of interests. *Ibid.*

In *Taylor by Taylor v. Cutler,* 306 *N.J.Super.* 37, 703 *A.*2d 294 (App.Div.1997), *certif. granted,* 153 *N.J.* 52, 707 *A.*2d 155 (1998), this court had occasion to evaluate a child's alleged cause of action for "preconception negligence" in the context of a motor vehicle accident. In determining whether or not such a claim was cognizable, we recognized that "under our system it is simply not enough to ground liability in the fact that the defendant did not act with reasonable care and that his carelessness caused injury." *Id.* at 42, 703 *A.*2d 294 (quoting *Weinberg v. Dinger,* 106 *N.J.* 469, 484–85, 524 *A.*2d 366 (1987); *Kelly v. Gwinnell,* 96 *N.J.* 538, 544, 476 *A.*2d 1219 (1984)). Rather, "[t]o establish liability, the plaintiff

must demonstrate that the defendant owes him a duty of care." *Ibid.* (citing *Weinberg, supra; Kelly, supra;* Leon Green, *Duties, Risks, Causation Doctrines,* 41 *Tex. L.Rev.* 42, 45 (1962)). Whether or not a duty of care exists is a question of law. *Id.* at 41, 703 *A.*2d 294.

■ In determining if a duty exists under particular circumstances, the court's "inquiry involves the identification, weighing and balancing of 'the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution.'" *Id.* at 42, 703 *A.*2d 294 (quoting *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 439, 625 *A.*2d 1110 (1993)). This analysis ultimately requires the court to determine if plaintiff was at risk of injury by defendant's conduct and whether the imposition of a duty on the defendant will promote the policy of conforming conduct to acceptable standards of care in the future. *Id.* at 44–50, 703 *A.*2d 294. "In every case the inquiry is 'both fact-specific and principled,' and the result must 'lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rules to govern future conduct.'" *Id.* at 42, 703 *A.*2d 294 (citing *Hopkins, supra,* 132 *N.J.* at 439, 625 *A.*2d 1110)).

■ When evaluated against these principles of tort duty, it is clear that the defendants in this case did not owe a duty of care to the plaintiff. As recognized by our Supreme Court, the duty owed to the parents is to diagnose and inform them of abnormalities to the infant so they can use that information to decide whether the pregnancy should be terminated. *See Procanik, supra,* 97 *N.J.* at 355, 478 *A.*2d 755; *Schroeder, supra,* 87 *N.J.* at 62, 432 *A.*2d 834; *Berman, supra,* 80 *N.J.* at 433, 404 *A.*2d 8. A doctor's negligence, therefore, deprives the parents "of the option to accept or reject a parental relationship with the child and thus cause[s] them to experience mental and emotional anguish upon their realization that they had given birth to a child inflicted" with an abnormality. *Berman, supra,* 80 *N.J.* at 433, 404 *A.*2d 8; *accord Procanik, supra,* 97 *N.J.* at 355, 478 *A.*2d 755; *Schroeder, supra,* 87 *N.J.* at

62, 432 *A.*2d 834. Although the case law recognizes that a duty is owed to the "parents" of the child, the inclusion of the husband is undoubtedly to promote and encourage family unity in forming decisions on such matters, and in further recognition of the reality that where the duty is breached, both parents share equally in the financial and emotional burdens of the child's illness. The fundamental premise of this cause of action, however, is "the availability of lawful eugenic abortions." *Hummel v. Reiss, supra,* 129 *N.J.* at 125, 608 *A.*2d 1341.

It serves no purpose of tort law to extend the duty to grandparents who have no patient/doctor relationship, have no power to act on the information that is the subject of the duty, and, unlike the husband, also have no financial obligation to support the handicapped child. No matter what a grandparent may want to do with the information a doctor may impart concerning a potential birth defect, the grandparent is powerless to act upon it. Only the daughter or daughter-in-law, as the case may be, has the constitutional right to terminate the pregnancy or bring it to term. For that reason, the creation of a tort duty to grandparents will not promote the policy of conforming conduct to acceptable standards of care.[4]

█  Further, plaintiff's right to sue cannot be derivative of the injury to the grandchild. As the Court recognized in *Procanik,* the parents' claim for "wrongful birth" is "independent from that of the child's" in that the parents' right to recovery is not " 'because of injury' to the child, but because of direct injury to their own independent rights," *i.e.,* the right to terminate the

---

[4] As a side note, we reject plaintiff's argument that the expansion of grandparents' rights in terms of visitation and custody of grandchildren supports an expansion of the "wrongful birth" cause of action. Under the common law, grandparents had no right to custody or visitation as against a parent. *See Mimkon v. Ford,* 66 *N.J.* 426, 430–32, 332 *A.*2d 199 (1975). It was not until the Legislature passed *N.J.S.A.* 9:2–7.1 that such rights were recognized. Thus, to the extent that grandparents' rights have evolved, those rights have been created by the Legislature, not our courts.

pregnancy. 97 *N.J.* at 356, 478 *A.*2d 755. Thus, if the parents' "wrongful birth" claim is rooted in the parents' independent rights, and not based upon injury to the child, it logically follows that a grandparent cannot maintain a cause of action for "wrongful birth" because of injury to the child. Clearly, in cases of this nature, the line drawn for bringing a cause of action for "wrongful birth" is whether the complaining party demonstrates a "direct injury to their own independent rights." *Ibid.; cf. Frame v. Kothari*, 115 *N.J.* 638, 649, 560 *A.*2d 675 (1989) (explaining that "[d]rawing lines ... is the business of the courts, and lines must be drawn to provide remedies for wrongs without exposing wrong-doers to unlimited liability"). Plaintiff here has suffered no direct injury based upon the violation of an independent right.

Affirmed.