Yvonne SMITH, individually, Willie Smith, individually, and Elijah Smith, a minor, by and through Yvonne Smith, Plaintiffs,

v.

Arvind SARAF, M.D., John Doe Professional Corporation/Partnership, John Doe Medical Providers A–Z, Defendants,

and

Arvind Saraf, M.D., Third–Party Plaintiff,

v.

The United States of America, Third–Party Defendant.

No. CIV. A. 98–04794.

United States District Court, D. New Jersey.

July 3, 2001.

John A. Talvacchia, Sharon Galperin, Stahl & DeLaurentis, Mount Laurel, NJ, for Third–Party Plaintiff, Arvind Saraf, M.D.

Robert J. Cleary, United States Attorney, Dorothy J. Donnelly, Assistant United States Attorney, Trenton, NJ, for Third–Party Defendant, the United States of America.

## OPINION

ORLOFSKY, District Judge.

In this medical malpractice action brought under the Federal Tort Claims Act, the Third–Party Defendant, the United States of America ("the Government"), has moved to dismiss the Third Party Complaint for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1), or, in the alternative, for summary judgment, pursuant to Federal Rule of Civil Procedure 56(c), on the Third Party Complaint of Third Party Plaintiff, Arvind Saraf, M.D. ("Dr.Saraf"). The Government's motion requires this Court to apply the frequently criticized, but still legally binding *Feres* doctrine, *see Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), to the New Jersey state law causes of action for "wrongful birth" and "wrongful life."

In the underlying complaint, Plaintiffs, Yvonne and Willie Smith ("Mr. and Mrs. Smith"), have brought a medical malpractice suit against Dr. Saraf on behalf of themselves and their minor son, Elijah Smith ("Elijah"). Plaintiffs allege that as a result of Dr. Saraf's negligence in failing to ensure that Mrs. Smith received particular prenatal tests while pregnant with Elijah, Plaintiffs were prevented from discovering that Elijah would be born with a severe birth defect, and thereby deprived of the choice to terminate the pregnancy. Mr. and Mrs. Smith have asserted a claim against Dr. Saraf for "wrongful birth," which, under New Jersey law, is the parents' claim for the birth of a severely birth-defective child. *See Procanik v. Cillo*, 97 N.J. 339, 478 A.2d 755 (1984). Elijah has asserted a claim for "wrongful life," which, under New Jersey law, is a child's claim for his birth defects and is separate and distinct from the parents' wrongful birth claim. *Id.* Dr. Saraf has impleaded the United States of America, alleging that the Walson Army Hospital, where Mrs. Smith went to have the prenatal test done, negligently failed to complete and report the results of the test to Dr. Saraf.

At first blush, the resolution of this case would appear to require nothing more than a straightforward application of state tort law. This case is unfortunately complicated, however, by the fact that Mrs. Smith was a servicemember on active duty status with the United States Air Force at the time of the alleged medical malpractice. While Dr. Saraf is not an employee of the United States, the medical care Mrs. Smith received from Dr. Saraf was paid for by the United States. Furthermore, Mrs. Smith was required to use Walson Army Hospital for the prenatal tests which lie at the heart of this case. Active duty

servicemembers are barred from recovering against the Government under the Federal Tort Claims Act ("FTCA") for injuries sustained "incident to service," pursuant to the Supreme Court's holding in *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). *See* Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2672–2680. The *Feres* doctrine was adopted to restrain courts from reviewing military decisions, particularly those made under the stress of combat operations, and to avoid the detrimental effect that judicial review would have upon military discipline. The application of the *Feres* doctrine has, however, been extended to bar claims for injuries which, on their face, appear wholly unrelated to military service, causing Justice Scalia to remark: "*Feres* was wrongly decided and heartily deserves the widespread, almost universal criticism it has received." *United States v. Johnson*, 481 U.S. 681, 700, 107 S.Ct. 2063, 95 L.Ed.2d 648 (1987) (Scalia, J., dissenting) (citation omitted); *see also Richards v. United States*, 180 F.3d 564 (3d Cir.1999) (Rendell, J., dissenting) (stating that "*Feres* represents more than a 'bad estimation' of what Congress intended to do (but did not do) in the Federal Tort Claims Act, for it is also being employed by many courts on a regular basis to deny a military employee's recovery, and to prevent the government's accountability, for injuries sustained in connection with essentially civilian activities wholly unrelated to military service"); *O'Neill v. United States*, 140 F.3d 564, 566 (3d Cir.1998) (Becker, C. J., dissenting)(criticizing the "harshness of the doctrine" and urging Supreme Court to reconsider *Feres*).

Because Mrs. Smith was undisputedly an active-duty service member at the time of the alleged malpractice, this Court must address the following questions: (1) whether the application of the *Feres* doctrine bars Mrs. Smith's claim for wrongful birth; (2) whether the application of the *Feres* doctrine bars the wrongful birth claim of Mr. Smith, Mrs. Smith's civilian husband and the father of Elijah Smith; and (3) whether the application of the *Feres* doctrine bars the claim of Mr. and Mrs. Smith's son, Elijah Smith, the civilian dependent of Mrs. Smith, for wrongful life, given that under New Jersey law, a child's claim for wrongful life is a separate claim which is not derivative of the parents' claim for wrongful birth.

For the reasons set forth below, I conclude that both Mrs. Smith's and Mr. Smith's claims for wrongful birth are barred by the *Feres* doctrine, but that Elijah Smith's claim for wrongful life is not so barred. Accordingly, I shall grant the Government's motion for summary judgment on Dr. Saraf's claim for indemnification and contribution for the claims of Yvonne Smith and Willie Smith for wrongful birth, and deny the Government's motion for summary judgment on Dr. Saraf's claim for indemnification and contribution on Elijah Smith's claim for wrongful life.

## I. INTRODUCTION

Yvonne Smith, her husband Willie Smith, and their minor child, Elijah Smith, are all Plaintiffs in the underlying cause of action. Mrs. Smith was an active duty member of the United States Air Force from August 14, 1992 through November 13, 1997, when she received an honorable discharge. Gov't.'s Exh. A. Pursuant to 10 U.S.C. § 1074(a), Mrs. Smith was eligible for health care paid for by the Air Force while she was on active duty.

In February, 1996, Mrs. Smith became pregnant. In April, 1996, Mrs. Smith commenced prenatal care with the Third–Party Plaintiff, Dr. Saraf. *See* Gov't.'s Appendix, Letter of Barbara Burton, M.D. Dr. Saraf is an obstetrician who has been in

private practice since 1976. Gov't.'s Statement of Undisputed Facts at ¶ 4. He is not an employee of the United States. *Id.* It is undisputed, however, that the Government "provided payment for [Mrs. Smith's] medical care by private physicians, but required that she obtain medical testing at the Walson Army Hospital at Fort Dix." Gov.'t.'s Br. at 2.

According to Mrs. Smith's medical chart, on May 6, 1996, she had "routine prenatal blood tests" performed. *See* Gov't.'s App., Letter of Barbara Burton, M.D. She was examined by Dr. Saraf on May 14, 1996, at which point her fetus was at fourteen weeks' gestation, and again on June 11, 1996, when her fetus was at eighteen weeks' gestation. There is a note on her chart, dated June 11, 1996, in which Dr. Saraf indicated: "Plaintiff did not do prenatal lab tests yet. Today she is given triple screen to be done. I also asked her to have prenatal tests to be done [sic]." Gov't.'s App., Letter of Barbara Burton, M.D. Despite this note, no report of a triple screen test appears in Mrs. Smith's chart. *Id.*

Mrs. Smith was seen again on July 9, 1996, and on July 30, 1996. Gov't.'s App., Letter of Barbara Burton, M.D. There is no notation on either date concerning the triple screen test. Mrs. Smith continued regular prenatal visits. *Id.* On October 11, 1996, an examination indicated that Mrs. Smith's fetus was breech, and an ultrasound to confirm the breech presentation was scheduled. On October 31, 1996, at 38 weeks' gestation, the ultrasound confirmed the breech presentation. *Id.* The ultrasound also revealed "a large fetal defect consistent with a neural tube defect as well as hydrocephalus." *Id.*

According to the entries on Mrs. Smith's chart, the ultrasound results were discussed with Dr. Saraf. Gov't.'s App., Letter of Barbara Burton, M.D. Dr. Saraf then called the laboratory to get Mrs. Smith's alpha-fetoprotein test results and was informed that the laboratory had no record that either the alpha-fetoprotein test or the triple-screen test had ever been performed. *Id.* There is a notation in her chart that no blood work had been done on Mrs. Smith since the routine prenatal blood tests which were completed on May 6, 1996. *Id.* Finally, there is a notation by Dr. Saraf in Mrs. Smith's chart indicating that he remembered giving Mrs. Smith "a second slip for serum triple screen when the first lab report on triple screen was messed up by the lab." *Id.*

Elijah Smith was born on November 5, 1996 with a large and "very severe" open neural tube defect. *Id.* This defect, also known as "spina bifida cystica," is characterized by an opening at the base of the spine through which the spinal cord and membranes protrude. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1557 (28th ed.1994). Surgery is normally performed within twenty-four hours of birth to close the opening and prevent infection, but the damage to the spinal cord itself is irreparable and may result in paralysis, bowel and bladder incontinence, leg and foot deformities, and learning disabilities. Plaintiffs allege that Elijah Smith will be permanently paraplegic and incontinent of bowel and bladder. *See* Compl. at Count I, ¶ 2. According to Plaintiffs' expert, 90–95% of patients who are confronted with a diagnosis of fetal spina bifida during the second trimester choose to terminate their pregnancies. Gov't.'s App., Letter of Barbara Burton, M.D.

Plaintiffs have sued Dr. Saraf, alleging that Dr. Saraf was negligent and deviated from the standard of care in failing to advise Mrs. Smith of testing which would have led to the prenatal diagnosis of spina bifida. Compl. at Count I, ¶¶ 8 and 9. Plaintiffs allege that, as a result of Dr. Saraf's negligence, they were deprived of the opportunity to make an informed decision as to whether or not to terminate the pregnancy, and have and will continue to

suffer emotional distress with respect to parenting a child with a severe birth defect. Finally, Plaintiffs allege that Elijah's "spina bifida and all related medical conditions have and will result in extraordinary medical expenses" throughout Elijah's life. Compl. at Count I, ¶¶ 11–13. Plaintiffs are seeking unspecified damages.

Following the initiation of Plaintiffs' suit against him, Dr. Saraf moved for leave to implead the United States of America as a Third Party Defendant. On September 15, 1999, the Court entered an Order granting Dr. Saraf's motion, and on September 24, 1999, Dr. Saraf filed a Third–Party Complaint. *See* Order, September 15, 1999.

In the Third–Party Complaint, Dr. Saraf alleges that he twice recommended to Mrs. Smith that she have the triple screen maternal serum alpha fetaprotein test performed. Third–Party Compl. at Count III, ¶ 7. Dr. Saraf further alleges that following his recommendation, Mrs. Smith twice presented herself at Walson Army Hospital to have the test performed. *Id.* at ¶ 8. Dr. Saraf alleges that he was never provided with the results of this test.

Dr. Saraf alleges that the United States of America or its agents were negligent in failing to perform Mrs. Smith's test and/or to report the results of the test to Dr. Saraf in a timely manner. On the basis of these allegations, Dr. Saraf contends that the United States is liable to him for contribution and indemnification for any judgment Plaintiffs may obtain against him.

## II. STANDARD OF REVIEW

The Government has moved to dismiss the Third–Party Complaint for lack of subject matter jurisdiction, or, in the alternative, for summary judgment. To support its contention that the motion should be considered as a motion to dismiss for lack of subject matter jurisdiction, the Government relies on the Ninth Circuit's decision in *Jackson v. United States,* 110 F.3d 1484 (9th Cir.1997). In *Jackson,* the Ninth Circuit held that "[a] motion to dismiss pursuant to the *Feres* doctrine, even if raised after the answer to the complaint, should be treated as a motion to dismiss for lack of subject matter jurisdiction under Fed. R.Civ.P. 12(b)(1) rather than as a motion for summary judgment." *Id.* at 1486; *see also Dreier v. United States,* 106 F.3d 844, 846 (9th Cir.1996).

The Tenth Circuit Court of Appeals, however, reached a different result in *Pringle v. United States,* 208 F.3d 1220, 1222 (10th Cir.2000). *Pringle* involved an FTCA claim brought by a service member who was injured after being ejected from a military social club. The District Court, finding that the service member's action was barred by the *Feres* doctrine, dismissed for lack of subject matter jurisdiction. The Tenth Circuit held that a "Rule 12(b)(1) motion to dismiss must be converted into a Rule 12(b)(6) motion or a Rule 56 summary judgment motion when resolution of the jurisdictional question is intertwined with the merits of the case. The jurisdictional question is intertwined with the merits of the case if subject matter jurisdiction is dependent on the same statute which provides the substantive claim in the case." *Pringle,* 208 F.3d at 1222. The Tenth Circuit concluded that the *Feres* doctrine, which arguably barred subject matter jurisdiction, is dependent on the Federal Tort Claims Act ("FTCA"), which provided the substantive basis for the claim. *Id.* at 1223. Based on this conclusion, the Court determined that the jurisdictional question was so intertwined with the merits of the case as to require the Court to treat the Government's motion as one for summary judgment, as opposed to dismissal.

Like *Pringle,* the jurisdictional question presented in this case is intertwined with the substantive claim, insofar as both implicate the *Feres* doctrine. Therefore, I shall adopt the Tenth Circuit's reasoning

in *Pringle*, and consider the Government's motion as a motion for summary judgment on the Third–Party Complaint.

The Third Circuit has held that "[o]n a motion for summary judgment, the court must determine whether the evidence shows that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir.1999) (citing Fed.R.Civ.P. 56(c)). "Any factual dispute invoked by the non-moving party to resist summary judgment must be both material in the sense of bearing on an essential element of the plaintiff's claim and genuine in the sense that a reasonable jury could find in favor of the nonmoving party." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "In opposing summary judgment, a party 'must do more than simply show that there is some metaphysical doubt as to material facts,' *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), but a court should not prevent a case from reaching a jury simply because the court favors one of several reasonable views of the evidence." *Abraham*, 183 F.3d at 287. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505; *see also Abraham*, 183 F.3d at 287. "Thus, while the nonmoving party must present enough evidence to demonstrate a dispute is genuine, all inferences in interpreting the evidence presented by the parties should be drawn in favor of the nonmoving party." *Abraham*, 183 F.3d at 287 (citing *Boyle v. County of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir.1998)). "Cases that turn crucially on the credibility of witnesses' testimony in particular should not be resolved on summary judgment." *Id.*

If the nonmoving party fails to oppose the motion by written objection, memorandum, affidavits and other evidence, the Court "will accept as true all material facts set forth by the moving party with appropriate record support." *Anchorage Assocs. v. Virgin Islands Bd. of Tax Rev.*, 922 F.2d 168, 175 (3d Cir.1990) (quoting *Jaroma v. Massey*, 873 F.2d 17, 21 (1st Cir.1989)). Even where the non-moving party has failed to establish a triable issue of fact, summary judgment will not be granted unless "appropriate." Fed. R.Civ.P. 56(e); *see Anchorage Assocs.*, 922 F.2d at 175. Rule 56(e) of the Federal Rules of Civil Procedure requires that the case be evaluated on its merits, with summary judgment being granted for the movant only if the movant is entitled to a judgment as a matter of law. *See Anchorage Assocs.*, 922 F.2d at 175.

## III. JURISDICTION

This Court has jurisdiction pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b),[1] 2673.[2]

---

1. This statute provides, in relevant part, as follows:

 Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or per1945, for injury or loss of property, or

 personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.
 
 28 U.S.C. § 1346(b).

2. This section provides, in relevant part, as follows:

## IV. ANALYSIS

### A. Governing State and Federal Law

The underlying claim was brought by Plaintiffs, Yvonne and Willie Smith, as individuals and on behalf of their minor child, Elijah Smith, against Dr. Arvind Saraf, to recover in tort for damages suffered when Dr. Saraf allegedly failed to request or obtain the results of a maternal serum alpha fetoprotein test, thereby resulting in the birth of Elijah Smith with spina bifida. Specifically, Yvonne and Willie Smith have sued Dr. Saraf for wrongful birth, which is the parents' cause of action to recover for the birth of a severely deformed child. The minor plaintiff, Elijah Smith, by and through his parents Yvonne and Willie Smith, has sued for wrongful life, which, under New Jersey state law, is the child's cause of action for having been born severely deformed. *See Procanik v. Cillo*, 97 N.J. 339, 478 A.2d 755 (1984) (establishing and defining causes of action under New Jersey law for wrongful birth and wrongful life). The New Jersey Supreme Court has explained that "[t]he terms 'wrongful birth' and 'wrongful life' are but shorthand phrases that describe the causes of action of parents and children when negligent medical treatment deprives parents of the option to terminate a pregnancy to avoid the birth of a defective child." *Procanik*, 97 N.J. at 347, 478 A.2d 755 (citation omitted).

Dr. Saraf has impleaded the United States of America as a Third–Party Defendant, alleging that Walson Army Hospital failed to complete and/or report the results of the test. Dr. Saraf has invoked the jurisdiction of this Court under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b). The FTCA created a limited waiver of the sovereign immunity of the United States which permits suit against the United States for the alleged negligence of federal employees. *Id.* Under the FTCA, a plaintiff may recover "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Id.*

The application of the FTCA has, however, been narrowed with respect to members of the armed forces. The *Feres* doctrine originated in an action brought by the executrix of a serviceman who was killed when the barracks in which he was sleeping burned down. *Feres v. United States*, 340 U.S. 135, 136, 71 S.Ct. 153, 95 L.Ed. 152 (1950). The plaintiff sued the

---

The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

If, however, in any case wherein death was caused, the law of the place where the act or omission complained of occurred provides, or has been construed to provide, for damages only punitive in nature, the United States shall be liable for actual or compensatory damages, measured by the pecuniary injuries resulting from such death to the persons respectively, for whose benefit the action was brought, in lieu thereof.

With respect to any claim under this chapter, the United States shall be entitled to assert any defense based upon judicial or legislative immunity which otherwise would have been available to the employee of the United States whose act or omission gave rise to the claim, as well as any other defenses to which the United States is entitled.

28 U.S.C. § 2674.

United States under the FTCA, claiming that it had negligently quartered the decedent in barracks which it knew to be unsafe due to a defective heating unit. *Id.* The Supreme Court held that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." *Id.* at 146, 71 S.Ct. 153.

■ The rationale for the *Feres* doctrine is based on the following three factors: (1) the "distinctively federal" relationship between the Government and members of the armed forces, which militates against the adjudication of a servicemember's claim under the law of the state where he or she happens to be stationed when the injury occurs; (2) the availability of Veterans' Benefits, which function as a statutory "no-fault" compensation scheme for injured servicemembers; and (3)the "peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts omitted in the course of military duty." *Stencel Aero Engineering v. United States,* 431 U.S. 666, 671, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977) (citations omitted). A court must consider the implication of each of the three factors when deciding whether *Feres* bars a particular claim. *United States v. Johnson,* 481 U.S. 681, 107 S.Ct. 2063, 95 L.Ed.2d 648 (1987).

■ Finally, the *Feres* doctrine has also been held to bar third-party claims against the United States for indemnification, where the underlying claim would be barred by the *Feres* doctrine. *See Stencel Aero Engineering v. United States,* 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977). *Stencel* involved a negligence action brought by a national guard officer for injuries he sustained when the ejection system on his fighter aircraft malfunctioned. The officer sued the manufacturer of the ejection system and the United States, alleging that the system malfunctioned as a result of their joint negligence. The manufacturer then filed a cross-claim against the United States, alleging that any malfunction in the system was due to faulty specifications, requirements, and components provided by the United States or persons under contract with the United States. *Id.* at 668, 97 S.Ct. 2054. After considering the application of each of the three *Feres* rationales to the cross-claim, the Supreme Court concluded that "the third-party indemnity action in this case is unavailable for essentially the same reasons that the direct action by [the service member] is barred by *Feres.*" *Id.* at 673, 97 S.Ct. 2054.

## B. Application of the *Feres* Doctrine to the Facts of This Case

The Government contends that the *Feres* doctrine precludes each of the three Plaintiffs in the underlying suit from recovering directly from the Government, and therefore, based upon the Supreme Court's decision in *Stencel,* also precludes them from recovering indirectly against the Government through a third party claim for indemnification or contribution. Therefore, the Government contends that it is entitled to summary judgment on Dr. Saraf's claim.

Dr. Saraf argues that the *Feres* doctrine would not preclude Yvonne Smith, Willie Smith, or the minor Elijah Smith from recovering against the Government. Therefore, Dr. Saraf contends that to the

extent the Government is found liable for Plaintiffs' injuries, Dr. Saraf is entitled to indemnification and contribution from the Government on the Plaintiffs' claims.

I shall consider the application of the *Feres* doctrine to the claims of each of the three Plaintiffs, Yvonne, Willie, and Elijah Smith, in turn.

### 1. Yvonne Smith

 Yvonne Smith filed suit individually against Dr. Saraf based on a theory of wrongful birth. Under New Jersey law, this cause of action is available to parents alleging that the negligent advice of a physician deprived the parent of the choice of avoiding conception or terminating a pregnancy. *Procanik*, 97 N.J. at 348, 478 A.2d 755. In this case, Mrs. Smith has alleged that Dr. Saraf failed to request or obtain the results of a test which would have revealed to her that her child would be born with spina bifida. Under a theory of wrongful birth, a parent may recover both for the extraordinary expenses of raising a severely defective child, and for the mental and emotional anguish the parent suffered as a result of being deprived of the opportunity to avoid conception or terminate the pregnancy which resulted in the birth of the defective child. *Berman v. Allan*, 80 N.J. 421, 431–434, 404 A.2d 8 (1979). A parent's wrongful birth claim is not derivative of the defective child's wrongful life claim, because the parent's claim is based on "direct injury to [the parent's] own independent rights, *i.e.*, the right to terminate the pregnancy." *Michelman v. Ehrlich*, 311 N.J.Super. 57, 66, 709 A.2d 281 (App.Div.1998) (citation omitted).

The Government argues that the *Feres* doctrine bars Mrs. Smith from recovery because her injury was incident to her military service. According to the Government, any injury experienced by an active duty service member as a result of treat-ment paid for or provided by the military is inherently "incident to service", even if the injury itself is unrelated to service. *See* Gov.'t's Reply Br. at 2. The Government cites numerous cases to support this argument. For example, the Fifth Circuit, relying on *Feres*, barred the widow of a service member from pursuing a medical malpractice suit involving the treatment her husband received by an Army physician. *Hayes v. U.S.*, 44 F.3d 377 (5th Cir.1995). The service member died when, during the course of an elective procedure, unrelated to any military activity, an Army surgeon severed the service member's hepatic vein. *Hayes*, 44 F.3d at 378. The Fifth Circuit held that "medical malpractice by a physician employed by the military, in a military hospital, and in the course of treatment of a person in active military service" falls within "the course of activity incident to service," and, therefore, the *Feres* doctrine barred the claim. *Id.* Similarly, the First Circuit held that a service member, who received allegedly negligent care for a knee injury he suffered off-duty, while playing basketball, was nonetheless precluded from suing the military hospital where he was treated because any and all care he received while on active duty status was necessarily "incident to service." *Borden v. Veterans Administration*, 41 F.3d 763 (1st Cir.1994). Finally, in *Madsen v. United States*, 841 F.2d 1011 (10th Cir.1987), the Tenth Circuit applied *Feres* to find that a service member's claim for negligence in the treatment he received at a military hospital following a motorcycle accident was barred. The Tenth Circuit summarized the *Feres* analysis as follows: "once it is determined that a service member ... was on active duty during the time military medical treatment was rendered, the treatment is necessarily incident to service and judicial inquiry ends." (*Id.* at 1014).

Dr. Saraf contends that the *Feres* doctrine does not bar Mrs. Smith from pursuing her claim against the United States, and that therefore he should be permitted to maintain the Third Party Complaint against the United States for contribution and indemnification for Mrs. Smith's claims against him. To support this argument, Dr. Saraf relies exclusively on the Fourth Circuit's decision in *Romero v. United States*, 954 F.2d 223 (4th Cir.1992). *Romero* involved a suit brought by a husband and wife who were both active duty members of the military at the time their child, Joshua, was born. Mrs. Romero apparently suffered from an incompetent cervix, which her treating military physicians failed to recognize during the course of her prenatal care. *Romero*, 954 F.2d at 224. As a result, Joshua was born prematurely and afflicted with cerebral palsy. *Id.* The District Court dismissed the Romeros' suit based on its conclusion that both Joshua's claims and his parents' claims were barred by the *Feres* doctrine. The Fourth Circuit reversed, holding that Joshua's claim was not barred because he was a civilian. *Id.* In reaching this conclusion, the Fourth Circuit explained that "claims brought by civilians and civilian dependents of service members who have directly sustained injuries from military personnel are not *Feres*-barred." *Id.* at 225. Furthermore, the Court concluded that if Joshua's claim was not *Feres*-barred, then his parents' claim for consequential damages was likewise not barred: "It is obvious that active duty service persons may recover consequential damages for non-physical injury they sustain as a result of injury to a civilian dependent." *Id.* at 227. According to Dr. Saraf, "[l]ikewise, Yvonne Smith should be entitled to recover from the United States for her emotional distress and extraordinary medical expenses resulting from the birth and condition of her son, Elijah." Pl.'s Br. at 9.

■■■■ This case is different from *Romero*, however, to the extent that Yvonne Smith's claim is not a claim for consequential damages based on harm to her dependent civilian son Elijah, but instead is a claim for wrongful birth, which Mrs. Smith alleged independently. Compl. at ¶¶ 9–11. In other words, Yvonne Smith alleged an independent claim for injury to herself, not a derivative claim based on injury to her son. Under New Jersey law, specifically, *Procanik*, 97 N.J. at 339, 478 A.2d 755, a "wrongful birth" claim, is, as a matter of law, the parents' independent claim for damages based on negligence resulting in the birth of a defective child. It is undisputed that New Jersey law governs the disposition of this case. It is also undisputed that Mrs. Smith was an active duty member of the armed forces at the time of her injury. The application of New Jersey law to the facts of this case compels this Court to reach the conclusion that the injury experienced by Mrs. Smith, to the extent that it resulted from the negligence of the Watson Army Hospital, was "incident to service." Because Mrs. Smith herself would be precluded from maintaining a negligence action directly against the United States, following the Supreme Court's decision in *Stencel*, Dr. Saraf is precluded from seeking indemnification from the United States for Mrs. Smith's injury. Accordingly, I conclude that the Government is entitled to summary judgment on Dr. Saraf's claim for indemnification and contribution for Mrs. Smith's wrongful birth claim.

**2. Elijah Smith (Yvonne and Willie Smith's Minor Child)**

The Government has also moved for summary judgment on Dr. Saraf's claim for indemnification and contribution on

Elijah's claim for wrongful life. According to the Government, Elijah's claims are also barred by the *Feres* doctrine, because the genesis of the injuries experienced by Elijah was the injury suffered by Mrs. Smith.

The so-called "genesis theory" was first articulated in this Circuit in *Hinkie v. United States,* 715 F.2d 96 (3d Cir.1983), as follows: "The *Feres* doctrine, in addition to barring injuries suffered by military personnel, extends to service-related suits when the injury to a civilian has its genesis in the actionable injury suffered by the military personnel incident to service." *Hinkie,* 715 F.2d at 98. *Hinkie* involved a case brought by the widow of a deceased service member on behalf of herself and her two children, one of whom was deceased and both of whom suffered from birth defects as a result of their father's alleged exposure to radioactive materials while he was on active duty in the United States Army. *Id.* at 97. The Third Circuit, relying on its opinion in *Mondelli v. United States,* 711 F.2d 567 (3d Cir.1983), rejected the plaintiffs' claims because the injuries of which the plaintiffs complained originated in chromosomal damage suffered by the father when he was on active duty status, and it was undisputed that the father himself would be barred by *Feres* from recovering. *Id.*

Similarly, the Court in *Mondelli* held that the *Feres* doctrine barred the daughter of a service member from recovering damages for the genetically transmitted retinal cancer she suffered as a result of her father's exposure to massive radiation while on duty in the United States Army. *Mondelli,* 711 F.2d at 568. In reaching this conclusion, the Third Circuit examined the three rationales underlying the *Feres*

doctrine, and concluded that only the third of those rationales discussed above, *supra* at 513, namely, the need to respect that "peculiar and special relationship of the soldier to his superiors," was relevant to the disposition of the plaintiff's claim. *Id.*[3] As the Court explained, however, this factor was dispositive:

> In many circumstances an action by a relative or dependent would raise the same issues, and require the same scrutiny of military decisions, as would an action by a soldier or sailor of the United States ... An action for damages by Rosemarie Mondelli would raise the same issues, and take the same form, as an action by her father Daniel. The complaint avers that Rosemarie's injuries derive from her father's exposure to radiation. At trial, Rosemarie would be required to contest the prudence of exposing her father to radiation. This examination is foreclosed by *Feres.*

*Id.* at 569. The Court concluded:

> We sense the injustice to Rosemarie Mondelli of this result. Rarely does the law visit upon a child the consequences of actions attributable to the parents. Nevertheless, the Supreme Court has construed the FTCA to subordinate the interests of the children of service personnel to the exigencies of military discipline. Although these are delicate policy judgments, they are in the final analysis committed to Congress. Consequently, we conclude, with reluctance, that the claims of Rosemarie Mondelli are barred.

*Id.* at 569–570 (citations omitted).

In addition to the Third Circuit's decisions in *Hinkie* and *Mondelli,* the Govern-

---

**3.** The Third Circuit found that neither the first *Feres* factor, the "distinctively federal" character of the relationship between the government and its armed forces, nor the second

*Feres* factor, the availability of Veteran's benefits, were applicable to the plaintiff's case in *Mondelli. Mondelli,* 711 F.2d at 569, n. 5.

ment also cites decisions from numerous other courts which have reached similar conclusions concerning the applicability of the *Feres* doctrine to claims brought by nonservice member dependents. Specifically, the Government relies on the Fourth Circuit's decision in *Minns v. United States*, 155 F.3d 445 (4th Cir.1998). *Minns* involved a FTCA suit brought by wives and children of Persian Gulf War veterans, alleging that the servicemen's exposure to toxins and pesticides in preparation for possible biological warfare in the Persian Gulf caused the children of these servicemen to be born with severe birth defects. *Id.* at 446. In reviewing the application of the three *Feres* factors to the plaintiffs' claims, the Fourth Circuit noted that:

> While justifications for the *Feres* doctrine include the fact that compensation is provided to servicemen through a no fault comprehensive benefit scheme and the fact that a serviceman's relationship to the government is a 'distinctively federal' one, its principal justification focuses on the unique relationship between the government and its military personnel: "Although the Court in *Feres* based its decision on several grounds, in the last analysis, *Feres* seems best explained by the peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty."

*Minns*, 155 F.3d at 448 (citing *United States v. Shearer*, 473 U.S. 52, 57, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985)). "Because [ ]non-servicemen's suits would require courts to engage in exactly the same intrusion into military decisions as would servicemen's suits, such as by requiring military personnel to testify against their commanding officers, they would pose almost as many problems-judicially and militarily-as would a serviceman's suit over the same issue." *Id.* at 449. Based on this reasoning, the Fourth Circuit concluded that "if a non-serviceman's injury finds its 'genesis' in the injury suffered by a serviceman incident to service, then the *Feres* doctrine bars the non-serviceman's suit." *Id.* at 449.

Applying this analysis to the plaintiffs' claims in *Minns*, the Fourth Circuit found that the genesis of those claims was in the injury to the servicemembers, namely, the exposure of the servicemembers to toxins in preparation for their service in the Persian Gulf. *Id.* at 449. Because allowing the plaintiffs' claims to proceed would involve "questioning [the] strategies, defense preparations, and the military's control of information," the Fourth Circuit concluded that the plaintiffs' case would "require the judiciary to enmesh itself deeply into military decisions" and "create the court-intrusion problem *Feres* seeks to avoid." *Id.* at 450. Therefore, the Court concluded that the *Feres* doctrine, applied through the "genesis test," barred the plaintiffs' claims. *Id.* at 451.

All three of these decisions, however, are distinguishable from this case, in that the claims in *Mondelli, Hinkie,* and *Minns* would have required courts to evaluate decisions made by the military in the course of military operations. Allowing these suits to proceed would have entailed the impermissible intrusion of the Court's authority into military affairs, because the Court would have been in the position of questioning or second-guessing military judgments. As the Supreme Court has explained, .

> The inescapable demands of military discipline and obedience to orders cannot be taught on battlefields; the habit of

immediate compliance with military procedures and orders must be virtually reflex with no time for debate or reflection. The Court has often noted "the peculiar and special relationship of the soldier to his superiors," *United States v. Brown, supra,* 348 U.S. at 112, 75 S.Ct. 141; *see U.S. v. Grimley,* 137 U.S. 147, 153, 11 S.Ct. 54, 34 L.Ed. 636 (1890), and has acknowledged that "the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty...." *Burns v. Wilson,* 346 U.S. 137, 140, 73 S.Ct. 1045, 97 L.Ed. 1508, (1953) (plurality opinion). This becomes imperative in combat, but conduct in combat inevitably reflects the training that precedes combat; for that reason, centuries of experience has developed a hierarchical structure of discipline and obedience to command, unique in its application to the military establishment and wholly different from civilian patterns. Civilian courts must, at the very least, hesitate long before entertaining a suit which asks the court to tamper with the established relationship between enlisted military personnel and their superior officers; that relationship is at the heart of the necessarily unique structure of the military establishment.

*Chappell v. Wallace,* 462 U.S. 296, 300, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983). The need for courts to refrain from such intrusion has been identified as the "primary justification for the *Feres* doctrine." *Minns,* 155 F.3d at 451.

In contrast, Plaintiffs in this case do not call upon this Court to review decisions made by commanding officers or military superiors in the course of military operations, but instead ask the Court to hold the Government responsible for damages caused to non-servicemembers by the alleged negligence of a military hospital in failing to perform routine prenatal tests on a service woman, and the resulting birth of a profoundly birth-defective child whose lifelong care needs will require extraordinary expense. When considering the application of the *Feres* factors to a similar case, in which a civilian child was born with cerebral palsy allegedly as the result of the military hospital doctor's failure to diagnose and suture his servicemember mother's incompetent cervix, the Fourth Circuit reached the following result:

> [A]pplication of the three *Feres* factors supports our conclusion that [the civilian child's] claim is not *Feres* barred. First, the relationship between [the child], a civilian dependant, and the government is not distinctively federal. Although civilian dependents of servicemembers are subject to some military rules and privy to some military privileges, their relationship to the military does not present the same tension between application of state and federal laws as is present with military persons. Second, as a civilian, [the child] has no other form of military compensation for his injuries. Finally, it is not likely that a suit alleging military negligence inflicted on a civilian child will impair the discipline necessary for effective service. This suit will not require the court to second-guess a decision of the military necessary to the accomplishment of a military mission.

*Romero,* 954 F.2d at 226. The Fourth Circuit explicitly considered and rejected the "genesis" analysis:

> We are persuaded that a genesis analysis is inappropriate here. The genesis test was intended to address purely derivative injury-civilian injury that derives from a service-related injury to a service person. In our view the relevant inquiry in a genesis analysis is whether a service member was injured, not whether the negligent act occurred dur-

ing active duty service. Again, [the child's] injury did not derive from any injury suffered by a service member, but was caused when the government breached an affirmative duty of care owed directly to [the child]. Because no service person was injured [the child]'s claim is not *Feres*-barred.

The Fourth Circuit conceded that proper prenatal care would have involved Mrs. Romero's [the service member's] body, but concluded that "[b]ecause the purpose of the treatment was to insure the health of a civilian, not a service member, *Feres* does not apply." *Id.* at 225.

The Eleventh Circuit reached a similar result in *Del Rio v. United States*, 833 F.2d 282 (11th Cir.1987). *Del Rio* involved an FTCA suit brought by a service member mother on behalf of herself and her twin children, alleging that the staff at the military hospital at which she received prenatal care failed to diagnose her pregnancy complications, thereby resulting in her premature labor, the death of one of the twins, and bodily injury to the other. The plaintiff sought damages for her personal injuries and those of the surviving twin. She also alleged a cause of action for wrongful death on behalf of the deceased twin. *Del Rio*, 833 F.2d at 284.

The Eleventh Circuit, after considering the applicability of each of the *Feres* factors to the servicemember's individual claim, concluded that her claim was barred by *Feres*. *Id.* The Court, however, found that the application of the three *Feres* factors to the surviving twin's claim "indicate[ ] that the maintenance of his personal injury claim will not circumvent the purposes of the FTCA." *Id.* at 287.

> First, the child does not have a "distinctively federal" relationship with the government. A civilian child whose parent is a member of the service "hardly bears the relationship to government that a soldier on duty does." *Lombard v. United States*, 690 F.2d 215, 232 (D.C.Cir.1982) (Ginsburg, J., concurring in part and dissenting in part), *cert. denied*, 462 U.S. 1118, 103 S.Ct. 3086, 77 L.Ed.2d 1347 (1983). Second, the government failed to identify any statutory benefits to which [the child] is entitled. Third, while a suit by [the child] may require the same type of inquiry into the physician's decisions as a suit by Ms. Del Rio, military discipline is not implicated to the same degree. *See id.* at 233 (Ginsburg, J., concurring in part and dissenting in part). The Court in *Johnson* was concerned about the possibility that a suit by service personnel "could undermine the commitment essential to effective service...." *Johnson*, 481 U.S. at 690, 107 S.Ct. 2063. A suit by a civilian child for the negligent administration of prenatal care need not impair the esprit de corps necessary for effective military service, nor will it require the court to second-guess a decision by military personnel unique to the accomplishment of a military mission. The three factors thus weigh in favor of permitting the appellant to maintain the claims against the government on behalf of her injured child.

*Del Rio*, 833 F.2d at 288. The Court found that the servicemember's claim for wrongful death on behalf of the deceased twin, however, presented a "much more difficult question," because the philosophy of the Florida Wrongful Death Act is "to allow recovery for the pain and suffering of the living rather than the dead." *Id.* at 288 (citing *Florida Clarklift, Inc. v. Reutimann*, 323 So.2d 640, 641 (Fla.Dist.Ct.App. 1975)). According to the Eleventh Circuit, "[t]he effect of the Florida wrongful death statute would be to award damages to ... an active member of the armed services, for injury personal to her." *Del Rio*, 833

F.2d at 288. Because such an outcome would effectively circumvent the *Feres* doctrine by allowing a servicemember to recover for injuries she suffered while on active duty, the Court concluded that the *Feres* doctrine barred the wrongful death claim. *Id.*

The Government urges this Court to reject the holdings of the Eleventh Circuit in *Del Rio* and the Fourth Circuit in *Romero*. With respect to *Del Rio*, the Government contends that the Eleventh Circuit's decision in that case is "the lone discordant voice in [a] unanimous chorus" insofar as it held that an infant's suit based on allegedly negligent prenatal care received by the infant's servicemember mother is not barred by the *Feres* doctrine. Gov't's Br. at 9 (quoting *Persons v. United States*, 925 F.2d 292, 297 (9th Cir. 1991)). I note that the same court stated that "*Del Rio* finds support in both reason and equity," and that *Persons*, because it involved allegations of negligence surrounding the suicide of a servicemember, was based on a fact pattern obviously distinct from that which is presented in this case. *Persons*, 925 F.2d at 297. Furthermore, I agree with the Eleventh Circuit's reasoning in concluding that claims which functioned to benefit the servicemember, including her personal injury claim and the claim she asserted on behalf of the deceased twin's estate for wrongful birth, implicated the *Feres* rationales and were therefore *Feres* barred, but the independent claim asserted by the surviving twin, a civilian whose allegations did not implicate any of the three *Feres* factors, was not *Feres*-barred.

Finally, while the Eleventh Circuit's opinion in *Del Rio* may have been a "lone discordant voice" at the time the Ninth Circuit decided *Persons* in 1991, it is no longer alone in its view, because at least one other Circuit has since adopted the Eleventh Circuit's reasoning. *See Romero*, 954 F.2d 223 (4th Cir.1992); *see also Graham v. United States*, 753 F.Supp. 994 (D.Maine 1990) (holding that *Feres* doctrine did not bar minor's FTCA claim for damages based on prenatal injuries allegedly resulting from medical malpractice by Air Force Hospital staff at the time of the delivery of the child to servicemember mother).

■ According to the Government, however, this Court must also reject the Fourth Circuit's holding in *Romero*, because that opinion has been superceded by the Fourth Circuit's later holding in *Minns*. In *Minns*, the Fourth Circuit considered claims brought by servicemembers' spouses for birth defects caused by their spouses' exposure to toxins in preparation for service in the Persian Gulf. The Court held that the *Feres* doctrine barred the claims, stating that "if the non-serviceman's suit is based on essentially the same facts as the potential serviceman's suit or the non-serviceman's suit could not have happened 'but for' the serviceman's cause of action, then under the genesis principle the *Feres* doctrine precludes the suit." *Minns*, 155 F.3d at 449. As I have already explained, however, *Minns* is legally and factually distinguishable from *Romero*. *See id.* Whereas *Minns* involved allegations of negligence in the course of a military operation, thereby implicating the third *Feres* factor, *Romero* involved an infant's medical malpractice claim based on the negligent prenatal care received by his servicemember mother, a claim which did not implicate any of the *Feres* rationales. In recognition of the differences presented by the cases, the *Minns* Court itself explicitly distinguished, and did not overrule, *Romero*. *Minns*, 155 F.3d at 449. Because the facts of this case are clearly similar to *Romero*, and not to *Minns*, this

Court shall adopt the reasoning of the Fourth Circuit in *Romero*.

In sum, following the Fourth Circuit's reasoning in *Romero* and the Eleventh Circuit's reasoning in *Del Rio*, I conclude that Elijah Smith's wrongful life claim does not implicate any of the three factors supporting the *Feres* doctrine. Furthermore, following *Romero* and in accordance with the law of the State of New Jersey, which recognizes the existence of a child's independent, non-derivative claim for wrongful birth, I conclude that the Government owed a duty to Elijah Smith which is separate and distinct from the duty it owed to his parents. Therefore, Elijah Smith's claim for wrongful birth is barred neither by a straightforward application of the *Feres* doctrine, nor by the application of the "genesis" theory of that doctrine. Accordingly, the Government's motion for summary judgment on Dr. Saraf's Third–Party Complaint against the Government for contribution and indemnification on Elijah Smith's claim for wrongful birth shall be denied.

### 3. Willie Smith

Finally, the Government has moved for summary judgment on Dr. Saraf's claim for indemnification and contribution on the claims of Willie Smith, the husband of Mrs. Smith and the father of Elijah Smith. Like Mrs. Smith, Mr. Smith has asserted a claim for wrongful birth against Dr. Saraf. The Government argues that Dr. Saraf's Third Party Complaint for indemnification and contribution for Mr. Smith's claim is barred by the *Feres* doctrine, because Mr. Smith's claim is identical to Mrs. Smith's claim and is "ancillary or derivative to the service[member]'s action for his/[her] own injury received incident to military service." Gov't.'s Reply Br. at 6 (quoting *Lombard v. United States*, 690 F.2d 215, 223 (D.C.Cir.1982)). Counsel for Dr. Saraf

neglected to discuss the specific issues raised by the application of the *Feres* doctrine to Mr. Smith's claim, instead simply asserting that "the same policy analysis [that governs Elijah Smith's claim for wrongful life] is applicable to permit the direct independent claims of the father, Willie Smith, for emotional distress under the New Jersey cause of action for wrongful birth." Pl.'s Br. at 9. Counsel for Dr. Saraf has oversimplified the issue and is simply incorrect on the law. The application of the *Feres* doctrine to Mr. Smith's wrongful birth claim raises issues that are legally distinct from those created by application of that doctrine to his son's wrongful life claim, and, for the reasons I shall now set forth, mandates a different result.

The New Jersey Supreme Court first recognized a cause of action for wrongful birth in *Berman v. Allan*, 80 N.J. 421, 404 A.2d 8 (1979). In that case, the Bermans, parents of a child born with Down's Syndrome, filed a medical malpractice action against Mrs. Berman's prenatal care providers, alleging that their negligence in failing to inform the Bermans of the likelihood that their child would be born with Down's Syndrome deprived the Bermans of the choice to terminate the pregnancy through abortion. The New Jersey Supreme Court agreed, holding, in light of the United States Supreme Court's decision in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), that a physician whose negligence deprived a mother of her right to decide whether her fetus should be aborted, "should be required to make amends for the damage he has proximately caused." *Berman*, 80 N.J. at 432, 404 A.2d 8. The New Jersey Supreme Court has since expanded the scope of damages available for wrongful birth claims to allow the parents to recover not only for the loss of the ability to make an informed choice about continuing a preg-

nancy which will result in the birth of a child with congenital defects, but also for the extraordinary expenses associated with the rearing of such a child. *Schroeder v. Perkel,* 87 N.J. 53, 432 A.2d 834 (1981). As the New Jersey Supreme Court explained, parents "have the right of their own either to accept or reject a parental relationship, and the deprivation of that right by negligent misconduct of another, creates a cause of action in the parents." *Id.* at 66, 432 A.2d 834.

 The problem, with respect to the application of the *Feres* doctrine to Mr. Smith's claim, is that the right which gives rise to a wrongful birth claim, as defined by the New Jersey Supreme Court, is vested in the *"parents"* of a birth-defected child. This Court can find no opinion in which a New Jersey state court has addressed the ability of a father, alone, to assert an independent claim for wrongful birth. This Court, however, finds guidance in the following language in a recent decision of the New Jersey Superior Court, Appellate Division:

> As recognized by our Supreme Court, the duty owed to the parents is to diagnose and inform them of abnormalities to the infant so they can use that information to decide whether the pregnancy should be terminated. *See Procanik,* 97 N.J. at 355, 478 A.2d 755; *Schroeder,* 87 N.J. at 62, 432 A.2d 834; *Berman,* 80 N.J. at 433, 404 A.2d 8. A doctor's negligence, therefore, deprives the parents "of the option to accept of reject a parental relationship with the child and

thus cause[s] them to experience mental and emotional anguish upon their realization that they had given birth to a child inflicted" with an abnormality. *Berman,* 80 N.J. at 433, 404 A.2d 8; *accord Procanik,* 97 N.J. at 355, 478 A.2d 755; *Schroeder,* 87 N.J. at 62, 432 A.2d 834. *Although the case law recognizes that a duty is owed to the "parents" of the child, the inclusion of the husband is undoubtedly to promote and encourage family unity in forming decisions on such matters, and in further recognition of the reality that where the duty is breached, both parents share equally in the financial and emotional burdens of the child's illness. The fundamental premise of this cause of action, however, is "the availability of lawful eugenic abortions." Hummel v. Reiss,* 129 N.J. at 125, 608 A.2d 1341.

*Michelman v. Ehrlich,* 311 N.J.Super. 57, 69, 709 A.2d 281 (App.Div.1998) (emphasis added).[4]

Consideration of the case law relied upon by the Appellate Division in *Michelman,* specifically, *Hummel v. Reiss,* 129 N.J. 118, 608 A.2d 1341 (1992), provides further guidance on the principles underlying the cause of action for wrongful birth. *Hummel* involved a child's allegation that the negligence of her mother's obstetrician resulted in the child's birth with severe psychomotor retardation. *Hummel,* 129 N.J. at 120, 608 A.2d 1341. The child, who was born in 1971, asserted a cause of action for wrongful life in 1988. It was undisputed that abortion was not legal in

---

**4.** *Michelman* involved a wrongful birth claim brought by a grandfather for the "severe emotional pain" he alleged he suffered as a result of his grandson's birth with Tay Sach's disease, a neurological disorder which is eventually fatal. *Michelman,* 311 N.J.Super at 60, 709 A.2d 281. The child's parents asserted their own, separate wrongful birth claim, and the child himself asserted a wrongful life

claim, in separate proceedings. *Id.* The Superior Court, Appellate Division, rejected the grandfather's claim, holding that the "extension of the cause of action for 'wrongful birth' in favor of a grandparent is inconsistent with our tort law and contrary to the principles undergirding that cause of action." *Id.* at 61, 709 A.2d 281.

1971 when the child was born. *Hummel,* 129 N.J. at 127, 608 A.2d 1341. After a comprehensive review of the legal theory underpinning wrongful life and wrongful birth causes of action, the New Jersey Supreme Court rejected the plaintiff's claim because the right upon which plaintiff's claim was premised was grounded in a woman's right to terminate a pregnancy, a right which did not exist at the time of the child's injuries. As the New Jersey Supreme Court noted:

> After the Supreme Court's decision in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), which established a woman's qualified right to terminate her pregnancy, this Court recognized causes of action of both parents and infants harmed by doctor's negligence in failing to inform parents of conditions that would bear on informed choice regarding whether to carry the pregnancy to full term. In a trilogy of cases discussed below, we recognized causes of action for wrongful birth (the parents' claims resulting form the birth of a severely-deformed child) and wrongful life (the child's claim for having been born with the deformity).

> \* \* \* \* \* \*

> The breaches of duty on *Procanik, Berman,* and *Schroeder* all revolve, at least in part, around the defendant-doctor's failure to diagnose a condition that might have caused the parents to terminate the pregnancy had they been informed of that condition. The wrongful-life and -birth cause of action are, therefore, dependent on a woman's right to terminate a pregnancy[.]

*Hummel,* 129 N.J. at 122, 126, 608 A.2d 1341.

■ As *Hummel* makes clear, the right which lies at the heart of wrongful birth cases, while often referred to as the "parents" right to terminate a pregnancy,

is the right to have an abortion-a right which is vested exclusively in the pregnant woman. *See Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The United States Supreme Court has considered, and explicitly rejected, state laws which required the consent of the husband or father of a fetus to his wife's abortion, holding that:

> We are not unaware of the deep and proper concern and interest that a devoted and protective husband has in his wife's pregnancy and in the growth and development of the fetus she is carrying. Neither has this Court failed to appreciate the importance of the marital relationship in out society. Moreover, we recognize that the decision whether to undergo or forego an abortion may have profound effects on the future of any marriage, effects that are both physical and mental, and possibly deleterious. Notwithstanding these factors, we cannot hold that the State has the constitutional authority to give the spouse unilaterally the ability to prohibit his wife from terminating her pregnancy, when the State itself lacks that right.

*Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 70, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); *see also Rothenberger v. Doe,* 149 N.J.Super. 478, 374 A.2d 57 (1977) (holding that "[t]he mother's right to an abortion decision is exclusively her prerogative and is founded on her constitutional right to privacy ... her right is not conditioned upon the consent of the husband or natural father"). Similarly, just as the Supreme Court has refused to give the father the right to prevent the mother from terminating a pregnancy, so have courts refused to allow a father to bring a wrongful birth suit against a mother whose pregnancy resulted in a birth unwanted by the father. *See, e.g., Jevning v. Cichos,* 499 N.W.2d 515, 518 (Minn.App.1993).

 In sum, this Court can find no reported state or federal law decision in which a father was found to have an independent right to assert a claim for wrongful birth. Based on this Court's review of the governing legal standards, it is clear that, under the present state of the law, a father's claim for wrongful birth is derivative of the mother's claim for wrongful birth. In other words, because the wrongful birth cause of action is premised on a violation of the right to terminate a pregnancy, and the right to terminate a pregnancy is a right held exclusively by the mother, a father cannot assert a wrongful birth claim that is independent or severable from the mother's claim for wrongful birth. Because Mr. Smith's claim for the wrongful birth of Elijah Smith is, as a matter of law, dependent on Mrs. Smith's claim for wrongful birth, and her claim is barred by the *Feres* doctrine, I conclude that his claim is also *Feres*-barred. Accordingly, I shall grant the Government's motion for summary judgment on Dr. Saraf's claim for contribution and indemnification on Mr. Smith's claim for wrongful birth.

## V. CONCLUSION

For the reasons set forth above, the Government's motion for summary judgment on Dr. Saraf's claim for indemnification and contribution on Mrs. Smith's claim for wrongful birth shall be granted. The Government's motion for summary judgment on Dr. Saraf's claim for indemnification and contribution on Elijah Smith's claim for wrongful life shall be denied. Finally, the Government's motion for summary judgment on Dr. Saraf's claim for indemnification and contribution on Willie Smith's claim for wrongful birth shall be granted. The Court will enter an appropriate form of order.

ORDER

This matter having come before the Court on the motion of the United States of America to dismiss the Third Party Plaintiff's Complaint pursuant to Fed. R.Civ.P. 12(b)(1) or, in the alternative, for summary judgment pursuant to Fed. R. Civ.P. 56(c), Robert J. Cleary, Esq., United States Attorney, and Dorothy J. Donnelly, Esq., Assistant United States Attorney, appearing on behalf of the United States, and John A. Talvacchia, Esq. and Sharon Galperin, Esq., Stahl & DeLaurentis, appearing on behalf of Third Party Plaintiff, Dr. Arvind Saraf, M.D.; and,

This Court having considered the moving papers filed by counsel for the United States and the opposition papers filed by counsel for Dr. Saraf, and the oral arguments of counsel;

For the reasons set forth in the OPINION filed today by the Court, IT IS, on this 3d day of July, 2001, hereby ORDERED that:

1. The motion of the United States for summary judgment on the Third Party Plaintiff's claim for indemnification and contribution for Yvonne Smith's wrongful birth claim is GRANTED; and,

2. The motion of the United States for summary judgment on the Third Party Plaintiff's claim for indemnification and contribution for Willie Smith's wrongful birth claim is GRANTED; and,

3. The motion of the United States for summary judgment on the Third Party Plaintiff's claim for indemnification and contribution for Elijah Smith's wrongful life claim is DENIED.